David W. FUGET, Jr., Plaintiff,

v.

Larry G. MASSANARI [1], Acting Commissioner of Social Security, Defendant.

No. 3–00–CV–90117.

United States District Court, S.D. Iowa, Davenport Division.

May 3, 2001.

1. Larry G. Massanari became the Acting Commissioner of Social Security on March 29, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Larry G. Massanari should be substituted, therefore, for Commissioner Kenneth S. Apfel, or for Acting Commissioner William A. Halter as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Janice E. Rutledge, Iowa City, IA, for Plaintiff.

William C. Purdy, Assistant United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, David W. Fuget, Jr., filed a Complaint in this Court on July 12, 2000, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

■ Plaintiff filed the application *sub judice* on September 30, 1996[2]. Tr. at 226–40. After the application was denied

initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on November 17, 1998. Tr. at 56–82. The ALJ issued a Notice of Decision—Unfavorable February 8, 1999. Tr. at 11–30. The ALJ's decision was affirmed by the Appeals Council of the Social Security Administration on May 26, 2000. Tr. at 6–8. Plaintiff filed his Complaint in this Court on July 12, 2000. On May 1, 2001, after Plaintiff's brief had been filed, the Commissioner moved to remand the case. However, as explained below, because substantial evidence supports a reversal with an award of benefits, the motion to remand is denied.

## EVIDENCE BEFORE THE ALJ

At the time of the hearing, Plaintiff was an 11 year old child. Tr. at 61. The ALJ found that Plaintiff has never engaged in substantial gainful activity and that his severe impairments are attention deficit disorder without hyperactivity, developmental motor coordination deficits and visual motor deficits, low average to borderline intelligence, obesity, and enuresis. Tr. at 29. The ALJ found, that none of Plaintiff's impairments, or combination thereof, meet, medically or functionally equal an impairment listed in Appendix 1 of Subpart P, Regulations No. 4 (the listings). It was the ALJ's decision, therefore, that Plaintiff was not disabled nor entitled to the benefits for which he had applied. Tr. at 30.

Plaintiff's early childhood medical records are found in the transcript from page 125 to 154. On November 8, 1990, when Plaintiff was nearly four years old., he

---

**2.** Plaintiff filed a previous application for benefits which was heard by an ALJ and reviewed by the Appeals Council. Judicial review was not sought. The Court is without jurisdiction to review the prior application. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

diagnosed with exogenous obesity. It was noted that he was at the 75th percentile for height and at the 95th percentile for weight. Tr. at 143. On September 4, 1992, Melinda Smith, M.D. saw Plaintiff for an evaluation of his obesity. Plaintiff's mother told the doctor that at lunch Plaintiff eats three to four times the amount of food that the other children eat and that he becomes irritated if food is denied. She told the doctor that Plaintiff engages in normal activity if pushed, but left to his own, he will choose to watch television or do other quiet activities. Commenting on Plaintiff's intellectual development, the doctor noted that Plaintiff was unable to count to 10, recite the alphabet, recognize letters or numbers or write his name. However, Plaintiff's parents reported that he had done well in preschool and was currently in kindergarten. Tr. at 148. On January 25, 1994, Plaintiff's parents spoke to Jon Fusselman, M.D. regarding Plaintiff's poor attention span and performance in school. Dr. Fusselman diagnosed possible attention deficit disorder and prescribed a trial of Ritalin. On February 1, 1994, Dr. Fusselman noted that Plaintiff was doing much better in school and that he had no apparent side effects from the Ritalin. Tr. at 154.

Plaintiff underwent a psychological evaluation in March of 1994. Tr. at 156–63. Plaintiff was administered portions of the Wechsler Intelligence Scale for Children—Third Edition. Tr. at 160. This test showed a verbal IQ of 94, a performance IQ of 81, and a full scale IQ of 87. Tr. at 157. Subtests of the Woodcock–Johnson Tests of Achievement—Revised showed Plaintiff's achievement to be commensurate with his low average to average intellectual abilities. It was noted that fine and gross motor coordination seemed to be somewhat difficult for Plaintiff. The psychologist wrote:

> David is a very friendly, happy child who engages willingly in conversation.

During testing, for the most part, David appeared to try to do his best, though at times it was difficult to keep him focused, possibly due to his enthusiasm about conversing. David's first grade teacher, Pat Wilske, indicates that David can be somewhat "spacey" at times, though his responses to classroom discussion are generally appropriate. Mrs. Wilske indicates that David's main problem appears to be that he is clumsy due to being overweight. He at times is picked on by other students due to his weight; however, David appears to take it all in stride. David's hygiene needs improvement.

Behavior rating scales completed by Plaintiff's teacher and by his mother indicated that conduct problems and hyperactivity were more than two standard deviations above the mean. Tr. at 161.

A report of Plaintiff's level of educational performance was written on March 16, 1995. Tr. at 169–71. Plaintiff qualified for services as a learning disabled student in the areas of reading, written language and math. Tr. at 170. Under the heading "Study Skills" the following was written: "David appears to want to do well in his second grade class. He works very hard. If he gets off task for a little while, it is easy to get him back on task by saying, 'David, we need to be doing ...' He is a very pleasant student to have in class. He has difficulty with fine motor skills which has direct implications for math and written expression." Tr. at 171.

On December 19, 1995, Plaintiff was seen at the University of Iowa Pediatric Learning/Attention Disorders Clinic for a psychological evaluation. Tr. at 196–201. Plaintiff was still taking Ritalin and was still receiving services for learning disabilities. Tr. at 196. Two of Plaintiff's teachers and Plaintiff's parents completed pediatric behavior scales. Significant con-

cerns were noted regarding inappropriate social behaviors, arousal, coordination, comprehension, and school performance. The parents noted many more behavioral concerns. Tr. at 198. Plaintiff continued to be overweight, continuing to eat large amounts of food. His parents noted that he frequently sneaks additional food and that he sometimes vomits after eating. Continued problems with enuresis were also noted. Tr. at 199. At the conclusion of the report, the following diagnoses were listed: Attention deficit disorder without hyperactivity; mixed developmental disorder; and, developmental motor coordination disorder. Tr. at 200.

An Individualized Educational Program was written on February 28, 1997, when Plaintiff was 11 years old and in the fourth grade. Tr. at 263–77. The special classroom teacher reported that Plaintiff was reading independently at the second grade level. It was also reported that Plaintiff was very slow with fine motor movements which hampered the amount of writing that he is able to do. It was noted that Plaintiff was working on cursive writing and that his writing had improved. Plaintiff was spelling at a third grade level. The teacher wrote: "In math class David still needs to master the basic addition, subtraction, multiplication, and division facts. He has a very difficult time maintaining his concentration during five minute timed tests." Tr. at 264. The teacher wrote: "David is the kindest and friendliest student in my classroom. He is quick to forgive other students." The regular classroom teacher reported that Plaintiff was achieving below average in language arts, science and social studies. The teacher said that the work was very difficult for Plaintiff and that he has "much difficulty paying attention and concentrating. He gets very little work completed during class time without constant reminders." This teacher also noted that Plaintiff interacted well, enjoyed being at school,

was polite, happy and seemed to have a good self-concept. Tr. at 265. On a School Activities Questionnaire dated January 9, 1998, the special education teacher wrote that Plaintiff was not coming to school clean and that he showers at school so that he will not be teased by his peers about body odor. Tr. at 283.

On September 9, 1997, Plaintiff was seen at Muscatine General Hospital after having eaten 18 Ex–Lax tablets before school. Plaintiff said that he took them because he had a stomach ache. Tr. at 317.

On October 17, 1997, Plaintiff's treating psychiatrist, James Yeltatzie, M.D. wrote a report for Disability Determination Services. Plaintiff was 10 years old and in the fifth grade with a diagnosis of attention deficit hyperactive disorder and borderline IQ. In addition, the doctor noted possible oppositional defiant features but not enough to meet the criteria for diagnosis. Plaintiff's medication was Ritalin with fair response to treatment and poor prognosis. The doctor wrote:

> David has a long history of behavior and cognitive limitations. His cognitive functioning is very concrete. He has significant problems with Attention Deficit disorder as well as prognitive (sic) impairments secondary to his borderline to low IQ. At times he is impulsive, moody and can be labile. His interactions with others, personal skills and behavioral skills is severely impaired. He is so disinhibited, very gullible, susceptible and prone to be taken advantage of by other people. In communicating, he has problems in being able to express his feelings, thoughts and needs.

The doctor noted that Plaintiff's pace is slow and deliberate and that he must have very simple tasks in order to perform. The doctor said that Plaintiff's ability to concentrate was impaired and that he cannot logically follow from A to B to C. Tr. at

319. The doctor concluded his report: "His difficulties are chronic and will be lifelong. His abilities to function on a cognitive level will be impaired and I do not see him as being someone who will be able to be gainfully employed in his adult life. He will require sheltered living as well as sheltered work position." Tr. at 320.

Plaintiff was seen for a compete physical at the Muscatine Health Center by R. Boutros, M.D. on February 2, 1998. Tr. at 326–28. It was noted that Plaintiff had been previously seen at the University of Iowa's endocrinology clinic and had been placed on their diet. Nevertheless, Plaintiff continued to gain weight. Plaintiff's father reported that he fixes a plate in the afternoon but that the child goes to the refrigerator and eats what he wants to. Plaintiff's father said that he locks some food in the freezer. It was noted that Plaintiff's weight was above the 95th percentile at 221 pounds. Tr. at 326. The doctor concluded his report by noting that it may be necessary to obtain the services of a psychologist. Tr. at 327.

Another Individual Education Program Review was written on February 2, 1998, when Plaintiff was 12 years old and in the fifth grade. Tr. at 292–307. It was noted that in the area of math, Plaintiff was functioning at the late fourth grade level and at the late third grade level in the area of written language. The author of the report wrote: "David's work pace is slow and labored, however, when given time to complete a task, he is able to perform well. David's level of thinking is very concrete; he often does not understand sarcasm and is unable to draw inferences." Tr. at 295. Plaintiff's regular classroom teacher reported that verbally Plaintiff demonstrates an average to above average understanding of social studies and science, but that he is able to complete little written work, and performs in the low average to average range on tests. It was noted that

listening was Plaintiff major source of learning. Although assignments were rarely completed, "[h]e does participate in class discussion often displaying a real knowledge of the topic." Tr. at 296. This teacher noted problems with personal hygiene but concluded her report: "David is an unusually kind, thoughtful child, quite forgiving of others. He has a good sense of humor." The special classroom teacher wrote that in the area of language arts, Plaintiff was functioning at the late third grade level. It was noted that Plaintiff was a "reluctant writer" and that: "He has a lot to share but would rather say it than write it." In math, Plaintiff was functioning at the beginning fourth grade level. Tr. at 297. Plaintiff had not yet mastered the basic addition, subtraction, multiplication or division skills. Tr. at 297–98.

Plaintiff was seen at the University of Iowa on April 15, 1998. The following was written under the heading Medical History:

> David Fuget is an 11 $\frac{4}{12}$ year old boy with obesity (he weighed 112 lbs at age 10½ years) who is seen in Pediatric Weight Management Clinic on April 15, 1998. He started gaining weight excessively at age 3 to 4 years. He has been followed for obesity since 1992 but has not been seen in clinic since January, 1993. He is now eating more than ever, sneaking food behind people's backs. He finds left overs and has broken into a locked freezer to get snacks. He eats food from other children's trays at school. He will not exercise. He watches television and Nintendo from 4 to 6 P.M. on week days and is constantly in front of the television. He does not like to play outdoors. He still wets the bed at night 2 or 3 times per week. He has a regular bowel movement once a day. No changes are seen in his hair. He sleeps well 8 to 10 hours per night. He denies headaches and vision changes.

He has no muscle aches, but complains of knee pain. He has shortness of breath after climbing one flight of stairs. Fifty per cent of his diet consists of fried foods. He has heartburn. He snores at night. He has low energy during the day but is not sleepy.

On physical examination, Plaintiff's weight was 103.5 kg, which was noted to be greater than the 95th percentile, and his height was 158.85 cm, also greater than the 95th percentile. Plaintiff's abdomen was described as morbidly obese. Diagnoses were exogenous obesity, borderline hypertension, and shortness of breath with minimal physical activity. Tr. at 329. Recommendations were made for dietary, behavioral, and exercise therapy. An admission to the Hospital School was considered. Tr. at 330.

In an undated letter addressed to Plaintiff's father, Robert P. Hoffman, M.D., of the Children's Hospital at the University of Iowa, stated that Plaintiff had evidence of sleep apnea during which he stops breathing while sleeping. Dr. Hoffman recommended tonsillectomy and adenoidectomy. Tr. at 341.

Plaintiff was admitted to the University of Iowa Hospital School from August 18 to 27, 1998. Tr. at 342–54. Diagnoses were: Attention-deficit disorder without hyperactivity; mixed developmental disorder; developmental motor coordination deficits; visual motor deficits; obesity; enuresis; encopresis improved. Under the heading History, in addition to what has been related elsewhere, it was noted that on January 15, 1997, Plaintiff had walked outside without shoes and experienced a severe frostbite to the bottom of both feet which required surgical debridement. Tr. at 342. On review of systems, no hyperactivity was reported, but Plaintiff's parents spoke of food seeking behavior at home and an unwillingness to participate in physical activity. During the hospitalization, Plaintiff's weight decreased from 111.1 kg to 107 kg which was described as a significant decrease. Tr. at 343. During the hospitalization, Plaintiff was seen by psychologist John Wadsworth, Ph.D. Tr. at 346–48. Dr. Wadsworth observed Plaintiff when he was taking Ritalin as well as on days when the medication was discontinued. When not receiving the medication, Plaintiff frequently appeared to have difficulty maintaining focus to academic and exercise activities. When receiving the medication, however, Plaintiff was noted to have much less difficulty with attention wondering. Dr. Wadsworth stated that Plaintiff is a very likeable young man who will need considerable adult support to make the lifestyle changes which will improve his quality of life. Tr. at 347. Addressing the issue of why Plaintiff overeats, Dr. Wadsworth wrote:

[I]n part, David's use of food as an activity results from his inability to develop and implement alternative activities in which he has a sense of competency. Food provides immediate gratification, especially when David is acting impulsively. It is difficult for David to develop alternative activities to food, which he can independently implement and meet his needs for satisfaction.

Tr. at 347–48. Plaintiff was also seen in occupational therapy to evaluate and treat his upper extremity and fine motor skills. Tr. at 348. After seven 30–45 minute sessions the therapist's impression was: "Dave demonstrates a significant delay in visual perception, visual motor, and motor proficiency skills. David's movement patterns and delays in visual perception, visual motor, and motor proficiency are affecting his handwriting, coordination, and play activities. These delays in turn are affecting his social interactions and self esteem." Tr. at 350. The physical therapy report states that Plaintiff participated in daily

aerobic exercises, such as exercise biking, treadmill walking, walking outside, basketball, racquetball, tag games, and race games, during his hospital stay. Tr. at 351.

On October 20, 1998, University of Iowa Senior Occupational Therapist Karen Blewer, OTR/L, in a letter to Plaintiff's counsel, wrote that when Plaintiff was seen in August of 1998, he had scored two standard deviations below average on the Developmental Test of Visual Motor Integration and .96 deviations below average on the Test of Visual Perceptual Skills. The hand writing test was not a standard test, and a standard deviation could not be given on the Bruininks–Osteretsky Test of Motor Proficiency because not all the subtests had been given. Tr. at 355.

On October 30, 1998, Dr. Yeltatzie wrote:

Young David Fuget, Jr., continues to be followed through this office for his Attention Deficit disorder with Hyperactivity and his Organic Personality disorder. He has baseline mental retardation for which he is also being followed. David continues to take Ritalin for his disorders to decrease his hyperactivity and impulsive behavior and to improve his time on task and his abilities to stay focused and stay seated in his chair. David has benefitted from the medication, but this is a life long problem for David and he will always be requiring some form of medication to assist him with his mental disorders. He continues to be as risk for being taken advantage of due to his gullibility, naivete, and blind trust in others and his impulsive behavior with poor insight and judgement.

Tr. at 356.

On November 3, 1998, University of Iowa psychologist Scott D. Lindgren, Ph.D. administered, among other tests, the Wechsler Intelligence Scale for Children— Third Edition (WISC–III). Tr. at 358. The psychologist wrote:

Intellectual ability was assessed using the WISC–III, and David demonstrated verbal skills in the average range, with relatively little scatter among subtests (scaled scores of 9–10). In contrast, all performance subtests administered were significantly below average, with scaled scores in the 4 to 5 range, which was suggestive of mild mental retardation for nonverbal processing. This finding of higher verbal and lower nonverbal skills is consistent with a nonverbal learning disorder. The extent of David's nonverbal deficits was not clear from earlier testing carried out in 1994, at which time his nonverbal intellectual abilities were closer to average. It appears, however, that as he has grown older, he has been unable to make normal progress in developing skills in motor coordination, fine-motor speed, and visual perception.

Tr. at 358. In the conclusion of his report, the psychologist wrote: "David is a very likeable young man with verbal abilities that are within the average range. In contrast, his perceptual-motor and nonverbal reasoning skills are significantly below average, currently falling in the range suggestive of mild mental retardation for nonverbal functions." The doctor noted that Plaintiff was, at the time of the evaluation, functioning at the third to early fourth-grade level whereas he was actually in the sixth grade (Tr. at 357).

**ADMINISTRATIVE DECISION**

In his decision, dated February 8, 1999, the ALJ, following the three step sequential evaluation prescribed for childhood disability claims, found that Plaintiff's has never engaged in substantial gainful activity. At the second step, the ALJ found that the severe impairments in this case are attention deficit disorder without hy-

peractivity, developmental motor coordination deficits and visual motor deficits, low average to borderline intelligence, obesity, and enuresis. Tr. at 29. At the third step, the ALJ found that Plaintiff's impairments do not meet or medically or functionally equal a listed impairment, and that Plaintiff is, therefore, not disabled. Tr. at 30.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910-11 (8th Cir.1998).

██ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136-37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

The Personal Responsibility and Work Opportunity Act of 1996 became effective on August 22, 1996. See Pub.L. No. 104–193, 110 Stat. 2105 § 211(b)(2) (1996). This legislation defines childhood disability as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i).

20 C.F.R. § 416.924(a) sets out a three step sequential evaluation process for childhood disability claims. At the first step, it is determined whether or not the claimant is working. If the claimant is not working, severe impairments are identified at step two. At step three, the severe impairments are compared to the childhood listings in Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P. If the impairment(s) meet or equal a listing, the child is disabled. If not, then the ALJ must find the child not disabled. In *Harper v. Apfel,* 2000 WL 1369507 at \*3 (S.D.Ala.2000), the Court wrote: "The current standard is *more stringent than that employed prior to the effective date* of Pub.L. No. 104–193, given Congress' decision, as stated in the House conference report, to confine the definition of childhood disability to the first three steps of the sequential evaluation process." *Harper* then quotes from 142 Cong.Rec. H8829, 8913 (1996 WL 428614), H.R.Conf.Rep. No. 104–725 (July 30, 1996):

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the

new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe" in its common sense meaning.

■ In order to be found disabled, a child must meet, medically equal or functionally equal a listed impairment. In the opinion of the Court, the ALJ's finding that Plaintiff's intelligence is in the low average to borderline range is not supported by substantial evidence in the record as a whole. While it is true that the 1994 testing showed that Plaintiff had a verbal IQ of 94, a performance IQ, of 81, and a full scale IQ of 87, the 1998 testing showed that his performance IQ was in the mild mental retardation range. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV), at page 40, states that IQ scores between 50–55 and approximately 70 fall within the mild mental retardation range. Dr. Lindgren's assessment of Plaintiff's intellectual capacity is consistent with the rest of the medical and educational evidence in the record, including Dr. Yeltatzie's testimony that Plaintiff has "baseline mental retardation" and an organic personality disorder.

In *Muncy v. Apfel,* 247 F.3d 728 (8th Cir.2001), the Court remanded the case to resolve a twenty-five point difference in IQ scores from tests several years apart. The Court wrote that mental retardation is not normally a condition that improves as an affected person ages. *Id.* at 734. Rather, continued the Court, absent evidence of a dramatic upswing in intellectual or adaptive functioning, or a challenge to the validity of the earlier scores, a person's IQ is presumed to be constant throughout his/her life. *Id.* at 734. In the case at bar, rather than seeing a dramatic upswing in Plaintiff's IQ, the opposite is true. Dr.

Lindgren, who diagnosed mild mental retardation in the performance scale, explained that as Plaintiff had gotten older his nonverbal skills had markedly deteriorated. In the opinion of the Court, Dr. Lindgren's testimony is evidence of a change in Plaintiff's IQ, unfortunately, for the worse. Dr. Lindgren's testimony is consistent with the other evidence in the record including the testimony of Plaintiff's treating psychiatrist, Dr. Yeltatzie, that Plaintiff should not be seen as someone who will be able to function independently in adult life.

■ Section 112.05(D) of the listings is met when a claimant has a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation of function.

■ Plaintiff's IQ, as evidenced by Dr. Lindgren's testing, clearly falls between the ranges of 60 through 70. In addition, the ALJ found, and the evidence supports, that Plaintiff has other severe mental and physical impairments which significantly affect his ability to function. These other severe impairments are attention deficit disorder, developmental motor coordination deficits and visual motor deficits, and obesity. Plaintiff, therefore meets the medical requirements of listing 112.05 and is entitled to the benefits for which he has applied. Because a remand to take additional evidence would only delay the receipt of benefits, an outright reversal is the appropriate remedy. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984).

## CONCLUSION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See*

*Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). Using the standards articulated in the congressional record cited above, it is the holding of this Court that Plaintiff's impairments are marked and severe "in [the] common sense meaning" of those words. Plaintiff has met that definition of disability from the date of his application. Substantial evidence on the record as a whole establishes that Plaintiff medically meets a listed impairment and that he is entitled to the benefits for which he applied. A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

Defendant's motion to remand for additional evidentiary procedures is denied. **This cause is remanded to the Commissioner for computation and payment of benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.