# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-1866

_____

| | | |
|---|---|---|
| Shirley Shontos, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Jo Anne B. Barnhart, Commissioner | * | |
| of Social Security Administration, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted:  December 12, 2002

Filed:  March 7, 2003

_____

Before WOLLMAN, LAY, and MAGILL, Circuit Judges.

_____

LAY, Circuit Judge.

Shirley Shontos appeals from a judgment of the district court affirming a final decision of the Commissioner of Social Security denying her Disabled Widow's Benefits.  We reverse with instructions to the district court to remand to the Commissioner for award of benefits.

I.

Ms. Shontos filed an application with the Social Security Administration for Disabled Widow's Benefits on December 7, 1998, following her husband's death on November 18, 1998. (A.R. at p.13). Prior to his death, Steven Shontos had worked at International Paper Company for thirty-two years. The Shontos had been married for thirty-two years. At the time of her husband's death, Ms. Shontos was fifty years old. She has a ninth-grade education, and no history of outside employment during the time period relevant to our inquiry.[1] She has done some babysitting for her granddaughter. The record is inconclusive as to whether she was paid for babysitting.

Ms. Shontos applied for disability benefits, claiming she was unable to work as a result of multiple impairments including mild mental retardation/borderline intellectual functioning; degenerative joint disease of the lower back and hands; arthralgias of the shoulders; hiatal hernia and gastroesophageal reflux disease; hypertension; major depressive disorder; adjustment disorder with mixed anxiety and depressed mood; generalized anxiety disorder; and dependent personality disorder. These impairments have been verified by the state's consulting physicians. Ms. Shontos disagrees that the combination of her mental and physical impairments did

---

[1]The record indicates that Ms. Shontos held one job briefly outside the home fifteen years ago. That job involved folding and packaging clothing at a dry cleaners. She was terminated after two months due to her inability to perform the work.

not equal the listed impairment under 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 12.05C.[2]

In December 1998, Ms. Shontos underwent a consultative psychological evaluation by Janet Drew, Ph.D., a licensed psychologist. Dr. Drew administered the Wechsler Adult Intelligence Scale-III. Dr. Drew noted that Ms. Shontos had significant difficulties with intellectual functioning, finding that she had below-average verbal and non-verbal abilities. Ms. Shontos' verbal intelligence quotient (IQ) score was 76, placing her in the fifth percentile; and her performance and full scale IQ's were both 72, placing her in the third percentile. Dr. Drew noted that Ms. Shontos' attention, concentration, and pace was variable. Dr. Drew's opinion indicated that Ms. Shontos may not be aware of the accuracy of her decisions, and may have difficulty demonstrating good judgment at all times. Dr. Drew noted that Ms. Shontos would need close supervision, support, and assistance in order to respond appropriately to changes in the work place.

On January 14, 1999, Ms. Shontos sought grief counseling from Julian Burn, Ph.D., a treating clinical psychologist at Gannon Center, a community mental health

---

[2]     12.05. Mental Retardation and Autism: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22) . . . The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function; . . .

20 C.F.R. Pt. 404, Subpt.P, App. 1, § 12.05C.

center in Clinton, Iowa. Dr. Burn's initial diagnosis of Ms. Shontos included: (1) major depressive disorder, (2) adjustment disorder with mixed anxiety and depressed mood, and (3) bereavement. In March 1999, Ms. Shontos requested that she see a female therapist for counseling. Dr. Burn referred Ms. Shontos to Sandy Bookmeyer, M.S. Ed., N.C.C., R.N., a counselor at Gannon Center. Ms. Bookmeyer is a nationally certified counselor who holds a master's degree in counseling. In addition, she is a registered nurse. Ms. Shontos met with Ms. Bookmeyer for weekly counseling from March 1999 through March 2000, after which they met approximately once per month. At the time Ms. Bookmeyer wrote her opinion regarding Ms. Shontos' work-related abilities, she had conducted forty-six counseling sessions with Ms. Shontos. Other mental health providers from Gannon Center regularly worked with Ms. Shontos, including Anabel Flaherty, Advanced Registered Nurse Practitioner, who reviewed and prescribed Ms. Shontos' psychiatric medications.

Nurse Practitioner Flaherty completed a "Questionnaire as to Mental Health Residual Functional Capacity"[3] for Ms. Shontos, indicating in response to fifteen of eighteen questions posed, that Ms. Shontos had "marked" to "severe" limitations[4] in residual functional capacity ("RFC"). In addition, Ms. Flaherty noted that Ms. Shontos was a highly anxious, depressed, dependent woman who had never

---

[3]A pre-printed note at the bottom of the Questionnaire at p.5 stated: "Note to Administrative Law Judge: The Social Security Administration's Regulations, POMS DI § 25020.125, states that a finding of a Marked or greater impairment in any of the areas listed above means that the individual is so restricted that a finding of 'Disabled' is merited."

[4]The Questionnaire defined a "marked" impairment as an impairment which affects the patient 25% to 50% of the time, and an "extreme" impairment as an impairment of ability to function at a level exceeding 75% of the time. (A.R. at p.160.)

functioned in traditional work settings, who met the criteria for dependent personality disorder.

Dr. Burn and Ms. Bookmeyer completed "§ 245.7 Form: Medical Opinion Re: Ability to Do Work-Related Activities (Mental)." Dr. Burn completed the form in November 1999, indicating that for the majority of questions, Ms. Shontos had "fair" or "poor or none"[5] ability to perform the activity in question. Dr. Burn noted "[s]he is quite anxious, worrysome (sic) and sensitive to criticism (and) conflict of any sort; very unsure of herself (and) lacks confidence (and) self esteem." (A.R. at p.189.) [T]he chance of anxiety would interfere with her productivity." (Id. at p.190.)

Ms. Bookmeyer completed the Questionnaire in June 2000, indicating that in most areas Ms. Shontos had "poor to none" ability to perform various types of work. Ms. Bookmeyer noted that Ms. Shontos had anxiety and dependency which "interfere significantly with her functioning." (A.R. at p.207.) Ms. Bookmeyer attached a letter to her opinion, which stated in part:

> Shirley has a great deal of difficulty focusing on things as simple as a conversation. As a result of her generalized anxiety disorder, major depressive disorder and dependent personality disorder, Shirley is constantly being distracted by obsessive thoughts and overriding worries about financial matters, her own health, her family's well being, whether she is making the correct decision about something, etc.
>
> We have also become aware of Shirley's obsessive compulsive tendencies, in addition to her other difficulties. Even during a 50 minute session, it often becomes necessary to interrupt her pressured and non stop speech pattern and ask her to listen to exactly what I am saying. Even when I do ask her to listen it is with obvious difficulty that she is

---

[5] "Fair" is defined as: the ability to function in this area is seriously limited, and "poor or none" is defined as: no useful ability to function in this area. (A.R. at p.189.)

able to focus in, even briefly, on what I am telling her. Shirley is not doing this because of rudeness, but as a result of the ever present and oppressive anxiety and depressive symptoms she experiences.

(A.R. at p.205.)

Both Dr. Burn and Ms. Bookmeyer anticipated that Ms. Shontos' impairments would cause her to be absent from work "more than four days per month." (A.R. at pp. 190, 208.)

State agency psychological consultants Dee Wright, Ph.D., and Mark Souza, M.D., reviewed Ms. Shontos' medical records. From this limited examination, Dr. Souza indicated that Ms. Shontos exhibited "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidence by . . . diagnosis of major depressive disorder and adjustment disorder with mixed anxiety and depressed mood," for purposes of §12.04[6] assessment. (A.R. at p.148.) Both Dr. Souza and Dr. Wright found that Ms. Shontos had "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)" as evidenced by borderline intellectual functioning, for purposes of § 12.05 assessment. (A.R. at pp.131, 149.) Dr. Wright was of the opinion that Ms. Shontos had moderate cognitive restrictions secondary to her borderline intellectual functioning, but despite these restrictions believed that Ms. Shontos was capable of performing non-complex, repetitive, and routine cognitive activity. Dr. Souza indicated that Ms. Shontos' impairments were severe and consistent with listings 12.04 and 12.05, but did not meet or equal a listed

---

[6]"12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."

20 C.F.R. Pt. 404, Subpt.P, App. 1, § 12.04.

impairment.  He offered no opinion as to whether her combination of impairments was medically equivalent to a listed impairment.  Dr. Souza was of the opinion that despite Ms. Shontos' limitations, she was cognitively and emotionally capable of carrying out simple, routine tasks without the need for continuous supervision.

In January 2000, Stanley Rabinowitz, M.D. conducted a physical examination of Ms. Shontos for the state.  He found that she had generalized anxiety and chronic depression, exacerbated by her husband's death.  He noted that her grip strength in both hands was 70% of normal with mild impairment of digital dexterity.  Dr. Rabinowitz indicated that Ms. Shontos had decreased range of motion in her lumbar spine, and had moderate difficulty getting on and off the examining table and squatting.  In addition, he stated that x-ray results confirmed a diagnosis of degenerative joint disease with expected functional limitations. The Social Security Administration denied Ms. Shontos' claim on February 12, 1999, and again on rehearing.  An administrative law judge ("ALJ") denied her claim following an administrative hearing held in December 1999.

The ALJ found that Ms. Shontos had no past relevant work, and had no transferable acquired work skills.  However, he found that Ms. Shontos retained the RFC to perform physical exertional and nonexertional requirements of work with the following limitations: lift no more than twenty-five pounds occasionally, lift ten-to-fifteen pounds repeatedly at a maximum; stand up to one hour at a time, sit from one-to-two hours at a time, and six to eight hours out of an eight hour work day; walk up to one hour at a time, with standing and walking up to six hours out of an eight hour work day; no repetitive bending, stooping, twisting, squatting, kneeling, crawling, climbing, pushing and pulling, or overhead work with the arms; avoid working at heights or with moving machinery; perform only simple, routine, repetitive work, not requiring close attention to detail; requires occasional supervision; work at no more than a regular pace, and tolerate no greater than a mild level of stress.  The ALJ considered testimony from a vocational expert in response to his hypothetical based

on Ms. Shontos' limitations, and found that she could perform the following jobs which exist in significant numbers in the national economy: library page, document preparer, or addresser.

The ALJ held that Ms. Shontos' impairments did not equal the medical equivalent of listing 12.05C impairment, and concluded that she was not disabled. 20 C.F.R. § 404.1520(f). The Appeals Council denied review. The district court subsequently affirmed the Commissioner's decision.

II.

This court's review of the district court's judgment "is limited to whether the Commissioner's denial of benefits is supported by substantial evidence in the record as a whole." Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998). Substantial evidence exists if a reasonable mind would find such evidence adequate to support a conclusion. Id.; Cf. Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996) (holding that evidence that supports the ALJ's decision as well as that which detracts from it must be considered).

"[T]he Social Security Amendments Act of 1954 defined 'disability' as 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .'" Bowen v. Yuckert, 482 U.S. 137, 146 (1987) (quoting 42 U.S.C. § 423 (d)(1)(A). The Commissioner has established a five-step evaluation process pursuant to the Social Security Act for determining whether a claimant is disabled within the meaning of the Act. Id. at 140; 42 U.S.C. § 423(d)(1)(A). At step three, the Commissioner must determine whether the claimant's impairment meets or equals one of the listed impairments. Yuckert, 482 U.S. at 141; 20 C.F.R. § 404.1520 (2000). If the claimant has an impairment that meets the medical criteria of a listed impairment, the claimant is presumptively disabled, and no further inquiry is necessary. Id.

A finding that a claimant's impairment is not equal to a listed impairment does not end the inquiry. The regulations provide that if a claimant has more than one impairment, the combined effect of the impairments will be considered. Id. The medical equivalence regulation states "[i]f you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment." 20 C.F.R. § 404.1526(a). The determination of medical equivalence is made based on medical evidence, supported by acceptable laboratory and clinical diagnostic techniques. Id. at (b). In addition, the Commissioner will consider medical opinions of designated medical or psychological consultants. Id.

The Commissioner has issued instructions for determining medical equivalence through the Program Operations Manual System ("POMS").[7]

---

[7]The applicable POMS provide:

D. Determining Medical Equivalence in Particular Situations

1. MEDICAL EQUIVALENCE AND MENTAL RETARDATION Listing 12.05C, Mental Retardation and Autism, applies primarily to adults with significantly subaverage intellectual functioning and deficits in adaptive behavior that were initially manifested in the individual's developmental period (before age 22). As with other mental impairment categories, the focus of Listing 12.05 is on the individual's inability to perform and sustain critical mental activities of work.

    \*   \*   \*

c. 12.05C

Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination

Here, the evidence of record establishes that Ms. Shontos' IQ of 72 was only slightly higher than the presumptive disability range of 60-70. Evidence from her treating mental health providers established that her anxiety, dependency, and depression would significantly interfere with her ability to work. In addition, evidence from Dr. Rabinowitz, the state's consulting physician, established that Ms. Shontos had physical limitations in addition to her mental health limitations. Dr. Rabinowitz offered the opinion that Ms. Shontos had functional limitations due to her diagnosis of degenerative joint disease. Although POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines. Berger v. Apfel, 200 F.3d 1157, 1161 (8th Cir. 2000); List v. Apfel, 169 F.3d 1148, 1150 (8th Cir. 1999).

There is no evidence that the ALJ considered the POMS guidelines. In reaching his decision that Ms. Shontos' impairment or combination of impairments were not medically equivalent to a listed impairment, the ALJ disregarded the POMS guidelines. He discounted the medical opinion of Ms. Shontos' treating psychologist, and the opinions of Ms. Shontos' therapist and nurse practitioner from Gannon Center, in favor of the opinions of non-treating, non-examining physicians and psychologists who relied exclusively on the medical reports of others, including Dr. Burn, to arrive at their opinions.

---

would very rarely be required. However, slightly higher IQ's (e.g. 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS § DI 24515.056.

First, the ALJ held that the opinion of Dr. Burn would not be afforded controlling weight because his "assessment appears not to have incorporated the evidence that when the claimant did get her medication that she did much better . . . ." ALJ Decision at p.11. The ALJ discounted Dr. Burn as a treating source, stating:

> Further, though the psychologist had available to him the treating notes of counselor, the record does not show that the psychologist saw the claimant at any time after March 1999; therefore, he was not a treating source at the time he completed the form, and he had not been for approximately half a year. The treatment records from the Gannon Center do not support the degree of limitations indicated by Dr. Burns (sic) in any of the areas he reported. For these reasons the opinions and conclusions of the psychologist cannot be afforded controlling weight

Id. (internal citations omitted).

The regulations do not define a treating source as one who is currently treating a claimant at the time they complete the Questionnaire. However, even if we were to assume that the ALJ's interpretation is correct, Dr. Burn was Ms. Shontos' treating clinical psychologist for two months. At the very least, Dr. Burn had what the regulations describe as an examining relationship, and accordingly, his opinion would be given more weight than a source who had not examined Ms. Shontos. 20 C.F.R. § 404.1527 (d)(1).

Regarding Ms. Bookmeyer's opinion, the ALJ made the following finding:

> It should be noted that Ms. Bookmeyer is not a licensed physician, and thus cannot be afforded great weight or even controlling weight with respect to her opinion. Further the extreme limitations here are not supported by the record. For instance, the nurse (Ms. Bookmeyer) indicated that the claimant had only a fair ability to maintain regular attendance and be punctual within customary, usually strict tolerances. However, nowhere in the record does it show that the claimant has ever

-11-

been late for an appointment. The nurse (Ms. Bookmeyer) has indicated that the claimant has a great deal of concern about financial matters, but poor or no ability to understand and remember detailed instructions. However, the nurse said that the claimant was so concerned about her financial situation that on any given day she can tell you what bills are due on each day of the month and very likely the amount of money that each bill entails. For the foregoing reasons the undersigned cannot afford this evaluation of the claimant as having great weight.

ALJ Decision at p.14 (internal citations omitted).

Regarding the opinion of Ms. Flaherty, the ALJ stated:

First, it appears that the form was completed after Ms. Flaherty had seen the claimant only one time. Second, Ms. Flaherty is not an acceptable medical source as defined in 20 C.F.R. §§ 404.1502, 404.1513(a)(d). Finally, the degree of impairment indicated on the form is not supported by the treatment records. Therefore, little weight is given to the opinions indicated on the form.

ALJ Decision at pp.9-10 (internal citations omitted).

The ALJ erred in determining that Ms. Flaherty was not an acceptable medical source. Medical equivalence is determined by considering medical evidence and other evidence of impairment. 20 C.F.R. § 404.1513. "Medical opinions are statements from physicians and psychologists or *other acceptable medical sources* . . . ." 20 C.F.R. § 404.1527(a)(2) (emphasis added). "In addition to evidence from the acceptable medical sources listed . . . we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to- - (1) Medical sources not listed . . . *nurse-practitioners . . . and therapists.*" 20 C.F.R. § 404.1513(d)(1) (emphasis added). The regulations read together, indicate that nurse practitioners and therapists are "other medical sources" whose opinions are considered medical opinions. Id. Accordingly, Ms. Flaherty and Ms. Bookmeyer are acceptable medical sources.

-12-

We further find the ALJ erred in discounting the opinions of Ms. Shontos' treating mental health providers. The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors. Generally, more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources. 20 C.F.R. § 404.1527(d). The regulations provide that the longer and more frequent the contact between the treating source, the greater the weight will be given the opinion: "When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." Id. at (d)(2)(i). A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record. Id. at (d)(2). Where controlling weight is not given to a treating source's opinion, it is weighed according to the factors enumerated above. Id.

Here, substantial evidence on the record as a whole reveals that Ms. Shontos sought mental health care frequently at Gannon Center between January 1999, and June 2000. Ms. Bookmeyer saw her forty-nine times over the course of fifteen months, which is more than adequate to provide a longitudinal picture of Ms. Shontos' impairment. Substantial evidence indicates that the Gannon Center provided a team approach to mental health care. Ms. Shontos was treated by therapists Burn and Bookmeyer. She was evaluated intermittently by Ms. Flaherty for the purpose of prescribing psychiatric medication. In addition, Ms. Shontos was seen twice a week by a social worker from Gannon Center. The opinions offered by Dr. Burn, Ms. Bookmeyer, and Ms. Flaherty reflected clinical judgments of professionals who had interacted with and observed Ms. Shontos over time. Their opinions and evaluations were based on a longitudinal perspective of Ms. Shontos. The opinions of these three treating mental health care providers were consistent.

-13-

The ALJ's assertion that these source's opinions were inconsistent with the record, and therefore should not be afforded controlling or great weight, is not borne out by the record. At most, the record is deficient in documentation to support their opinions, e.g., documentation in the record regarding Ms. Shontos' attendance. The ALJ criticized the opinion by Dr. Burn that Ms. Shontos would have "poor to no ability to deal with the stress of semi-skilled and skilled work, and would have a fair ability to understand and remember detailed instructions, carry out detailed instructions, and maintain socially appropriate behavior." (ALJ Decision at p.11.) The ALJ commented that this opinion by Dr. Burn "appears not to have incorporated the evidence that when the claimant did get her medication that she did much better, was able to smile and laugh at times, appeared much calmer, and said she had been sleeping better since receiving the medication." Id. This was an inference on the part of the ALJ. No medical source provided an opinion that the fact that Ms. Shontos did better while taking prescribed medication negated Dr. Burn's opinion that Ms. Shontos would have difficulty with detailed instructions.

In Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975), we held, "[a]n administrative law judge may not draw upon his own inferences from medical reports." Here, the ALJ improperly drew inferences from the medical reports, and relied on the opinions of nontreating, nonexamining medical consultants who relied on the records of the treating sources to form an opinion of Ms. Shontos' RFC. The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole. Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).[8]

_____

[8]When the analysis reaches step five, the Commissioner has the burden to show: (1) the claimant retains the residual functional capacity to do other kinds of

-14-

III.

We find that the ALJ did not have adequate reason to discount the opinions of Gannon Center mental health care providers Dr. Burn, Ms. Bookmeyer, and Ms. Flaherty. The opinions of these treating sources should have been afforded greater weight than those of the nontreating, nonexamining consultants.

We find that there is substantial medical evidence on the record as a whole from Ms. Shontos' treating mental health providers that she suffers from marked disabilities that would interfere with her ability to work. There was substantial medical evidence to support a finding that the combination of Ms. Shontos' impairments: borderline intellectual functioning, psychiatric affective disorders, and physical disabilities, were medically equivalent to listing 12.05C.

Accordingly, we reverse the judgment of the district court with instructions to remand to the Commissioner for calculation and award of benefits.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

work, and (2) that such other work exists in substantial numbers in the national economy. McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982 ) (en banc); Nevland, 204 F.3d at 858. Reaching step five, relying on the opinion of a vocational expert, the ALJ found that Ms. Shontos retained the RFC to perform the physical exertional and nonexertional requirements of work enumerated above.