Kenneth D. HORTON, Plaintiff,

v.

Jo Anne B. BARNHART[1],
Commissioner of Social
Security, Defendant.

No. 3:01–CV–90163.

United States District Court,
S.D. Iowa,
Davenport Division.

April 8, 2003.

1. Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff's attorney is: Michael Depree, Esq., Davenport.

Defendant's attorney is Gary L. Hayward, Esq., Assistant United States Attorney, Des Moines.

### ORDER

PRATT, District Judge.

Plaintiff, Kenneth D. Horton, filed a Complaint in this Court on November 23, 2001, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

### BACKGROUND

Plaintiff filed applications for Social Security Disability benefits and Supplemental Security Income benefits on September 29, 1999. Tr. at 108–10 & 397–99. Plaintiff claimed to have become disabled June 2, 1999. Tr. at 108. Plaintiff is insured for Title II benefits through September of 2003. Tr. at 118. Plaintiff had made applications for SSI benefits in August of 1994 (Tr. at 412–14) and in December of 1995 (Tr. at 388–90). The ALJ pointed out that the initial denials of those applications were more than two years old and were beyond her authority to reopen.[2] Tr. at 34. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on March 20, 2001. Tr. at 32–110. The ALJ issued a Notice Of Decision—Unfavorable on June 20, 2001. Tr. at 12–21. After the decision was affirmed by the Appeals Council on October 18, 2001, (Tr. at 7–9), Plaintiff filed a Complaint in this Court on November 23, 2001. On February 20, 2002, the Court granted Defendant's Motion To Remand because the Commissioner was not able to prepare a record for judicial review. In a pleading filed December 23, 2002, the Commissioner informed the Court that the record had

---

2. See 20 C.F.R. § 416.1488(b).

been located and asked the Court to re-open the case and issue a briefing sched-ule. Both parties have now filed their briefs and the case is fully submitted.

## MEDICAL RECORDS

On November 4, 1993, Plaintiff was seen at the emergency room. He reported that about two weeks before, he had been hit by a fork truck. A few days after being hit by the fork lift, a sheet of metal fell on him. He did not see a doctor after either event, but was complaining of pain in both shoulders, down his back into both legs. Tr. at 210. X-rays of Plaintiff's spine, left shoulder and chest were all reported to be normal. Tr. at 211. In addition to these injuries, Plaintiff was noted to have a prominent cough with a mild sore throat. Tr. at 212. Plaintiff was prescribed medi-cation for his cough, Motrin 600 for his pain, and given a note to be off work for four days. Tr. at 213.

Plaintiff was seen at Samaritan Health System on November 7, 1997, after he injured his left foot. In the previous week, Plaintiff had fallen from a roof, and later fell through a deck. He complained of pain and swelling in his ankle. X-rays did not show a fracture or dislocation. The diagnosis was acute ligament strain of the ankle. Plaintiff was given a Prowalker brace and told to wear it at all times except when showering. He was told to wear the brace for 4 to 6 weeks. Tr. at 222. When Plaintiff saw R. Khanna, M.D. on November 17, 1997, he was not wearing the brace. Plaintiff's foot was still swollen and tender and "incompletely healed." The doctor recommended that Plaintiff continue to wear the brace and to remain off work for another two weeks. Plaintiff was sent to physical therapy. On Novem-ber 26, 1997, Plaintiff said that the physi-cal therapy was too painful to continue. Although the foot still had some discolora-tion, and was colder than the right foot, Plaintiff was wearing regular boots and appeared to be walking normally. Dr. Khanna wrote that the condition of the foot was "almost like a sympathetic dystro-phy type picture." Tr. at 221. When he was seen on December 3, 1997, Plaintiff said that he had aching in his left foot and ankle and that the foot and ankle were extremely cold requiring that he wear up to four socks at a time. At home, Plaintiff said that he used a heating pad which provided relief. On exam, Plaintiff had a normal gait with full weight bearing. Tr. at 220.

Plaintiff saw Timothy J. Miller, M.D. on December 8, 1997, on referral from Dr. Khanna to evaluate Plaintiff's ankle injury. Tr. at 338. Dr. Miller's diagnosis was acute ligamentous strain, possible chronic regional pain syndrome. The doctor was unable to do a sympathetic block that day because some of his equipment was not functioning. The doctor prescribed medi-cation and wrote that he would proceed with the sympathetic block if the medi-cation did not provide relief. Tr. at 339.

Plaintiff returned to Dr. Miller on Janu-ary 2, 1998. He said he had been trying to work but was having pain in his low back which was shooting down his left leg to the foot. The doctor prescribed Medrol Dose-pack and made a referral for physical ther-apy and said that he would consider a lumbar epidural steroid injection. Plain-tiff's ankle had no swelling and the doctor saw no evidence of reflex sympathetic dys-trophy. Tr. at 337. On January 16, 1998, Plaintiff saw Dr. Miller and said that he wanted to return to work at full duty. The ankle appeared to fully healed and the doctor said that it had an excellent range of motion with no swelling and with no pain on manipulation. Tr. at 336.

On March 11, 1998, Plaintiff returned to Dr. Khanna and said that although his

ankle had healed, he continued to have pain in his lower back. Plaintiff denied any recent trauma. Plaintiff was referred to a neurosurgical group in Davenport, Iowa. Tr. at 220. When Plaintiff saw Dr. Miller on March 23, 1998, the doctor's diagnosis was: "probable myofascial pain, low back, with low back strain persistent following a fall." The doctor had x-rays taken and said that on first viewing, no abnormalities were seen. Tr. at 334.

Plaintiff was seen by Dr. Miller on June 26, 1998 complaining of having parèsthesias[3] throughout both legs all the way to his toes. Plaintiff said that after working for 15 minutes, "his legs get so numb that he really cannot move them." Dr. Miller ordered a CT scan of the lumbar spine to rule out stenosis or herniated disk. Tr. at 333.

On August 13, 1998, Plaintiff went to Samaritan Health System's emergency room to complain of a three day history of headaches, dizzy spells, nausea and vomiting. He also had cough and congestion. It was noted that Plaintiff smokes but does not drink. Tr. at 234. Michael Foggia, D.O., diagnosed infectious mononucleosis. Plaintiff was sent home to bed. The doctor wrote that since Plaintiff was not working, it was not necessary to write a work excuse. The doctor's other diagnoses were: asthma, bronchitis with bronchospasm, urinary tract infection, and nausea and vomiting. Tr. at 235. Two days later, Plaintiff returned to the emergency room after he became worried because of high fever. Plaintiff was given medication, and told that he had a viral infection which would cause his fever to wax and wain for up to a week. Tr. at 238.

Plaintiff was admitted to the hospital at Samaritan Health System on June 1, 1999, after he suffered an acute inferior wall myocardial infarction. On June 3, 1999, Plaintiff signed out of the hospital against medical advise. Tr. at 240. After he left Samaritan Health System, Plaintiff was admitted to the University of Iowa Hospitals and Clinics on June 3, 1999 where he stayed until June 6. It was noted that Plaintiff has a strong family history of heart disease with brothers and sisters having died of the illness. Tr. at 244. Plaintiff was back at the University of Iowa from July 20 to 22, 1999. On July 21, he underwent cardiac catheterization with angioplasty plus stent placement to a lesion of the left anterior descending artery. Tr. at 247. On discharge, Plaintiff was instructed to remain off work for one week, and to restrict his lifting to 20 pounds for one or two weeks thereafter. Tr. at 248.

On August 16, 1999, Plaintiff was treated at the emergency room of Samaritan Health System after he cut his hand with a saw. The two cm. laceration wound was cleaned and stitched. Tr. at 258.

Plaintiff returned to the University of Iowa on September 28, 1999. Plaintiff reported that he had gone back to work after the angioplasty, but began having chest pain about two weeks later. He continued working but had become limited by chest pain and dyspnea[4]. Plaintiff reported that he had sustained the cut on his hand in August, during a brief episode of syncope. Plaintiff was concerned that he did not appear to be able to continue his work in construction. Tr. at 258. Robert B. Felder, M.D. wrote that the recurrence of Plaintiff's anginal chest discomfort may in-

---

3. Numbness. Stedman's Medical Dictionary, 27th Edition.

4. Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs. Stedman's Medical Dictionary, 27th Edition.

dicate a re-stenosis of the coronary artery. The exertional dyspnea could have been caused by the heart condition or by chronic obstructive lung disease which the doctor said was poorly controlled. Dr. Felder stated that Plaintiff needed to undergo another catheterization and that Plaintiff should remain off work until that could be scheduled on the following Friday. Tr. at 260. A University of Iowa history reported on October 4, 1999, states that Plaintiff had, in fact, undergone a second catheterization in July, after which was complicated with a post-catheterization hematoma. Tr. at 262.

On August 31, 1999, Plaintiff saw Timothy F. Kresowik, M.D. at the University of Iowa because of pain in his left leg which had been present for a month. Plaintiff said that he had the pain with standing or walking. The doctor wrote that he found no evidence of lower extremity occlusive disease and that Plaintiff symptoms suggest "neurogenic claudication likely related to his low-back problems." Tr. at 261.

Plaintiff was admitted to the hospital at the University of Iowa on September 29, 1999. Plaintiff was admitted because he had been having chest pain and the doctors scheduled him for another catheterization on October 1, 1999. Tr. at 262. On the morning of September 30, 1999, Plaintiff became agitated when a phlebotomist was drawing blood, and wanted to leave the hospital. Although advised against it, he was discharged on the morning of the 30th. Tr. at 263.

A report written to Q. Rasheed, M.D. by Dr. Felder on November 17, 1999, states that on October 8, 1999, Plaintiff underwent another catheterization which showed diffuse disease of the right coronary artery, a 20% stenosis in a segment of the left circumflex artery and 20% stenosis of a segment of the left anterior descending artery. On November 17, Plaintiff returned to the hospital complaining of fatigue after about 45 minutes at work. The doctor wrote: "He goes to work at about 7:00 in the morning, works for about 45 minutes, and then has to sit down and rest. He states that he rests a lot during the day, then goes home at 2:00 or 3:00 in the afternoon because he cannot work any longer, and then frequently falls asleep." Plaintiff had been working clearing trees but complained of lightheadedness with bending over. He noted shortness of breath with relatively minimal activity, according to the doctor. Plaintiff reported discontinuing cigarette smoking. On physical examination, Plaintiff appeared depressed but in no acute distress. His chest was clear. Tr. at 268. Dr. Felder wrote that Plaintiff had a number of symptoms which Plaintiff felt limited his ability to work. The most significant was difficulty breathing. Dr. Felder wrote that he was arranging for Plaintiff to be seen in the pulmonary clinic as well as by a neurologist to evaluate Plaintiff's complaints of forgetfulness and because of an episode of left arm and facial numbness. Tr. at 269. A report of a stress test, dated November 17, 1999, states that Plaintiff "had his usual, continuous [chest pain] before, during and after exercise. Dyspnea, objectively, was mild." The author of the report also wrote that Plaintiff had good exercise tolerance limited primarily by leg pain. Tr. at 270. On December 2, 1999, L. Geist, M.D., wrote that a pulmonary function test revealed a moderate obstructive ventilatory defect. Because there was improvement post bronchodilator[5], the doctor wrote that the defect fell short of

5.  An agent, such as epinephrine or albuterol, which causes an increase in caliber of a bronchus or bronchial tube. *Id.*

meeting American Thoracic Society criteria for significance. Tr. at 274.

Plaintiff was seen by John H. Sunderbruch, M.D. for a disability physical on December 6, 1999. Plaintiff told the doctor that he had difficulty walking or sitting because of back pain. "He states he has no difficulty with breathing except when he is around dust; occasionally he has always had what he calls asthma and has used Primatene tablets for this." Plaintiff said he had been told not to lift over ten pounds because of his heart problems. Tr. at 277. On physical examination, Plaintiff was able to perform all range of motion activities although he was fearful of some of the activities used to test the low back. He was, however, able to do all the activities he attempted. His range of motion was within normal limits. Dr. Sunderbruch was unable to hear any evidence of emphysema. The doctor wrote there was no basis for disability because of Plaintiff's heart, and that there was no "positive proof" of difficulty in Plaintiff's back. Tr. at 278.

Plaintiff was seen by Matthew Rizzo, M.D., in the University of Iowa's Department of Neurology on January 14, 2000, because of his complaints of decreased concentration, decreased memory, "spells," and left sided numbness. Plaintiff described episodes of "feeling weird" that included blurry vision and left sided dysfunction. These episodes last from one to two or from five to ten minutes, and occur every three to four days, or once or twice a day. Although Plaintiff said that he had spells while driving, he continued to drive. Plaintiff also said that in spite of COPD, he was smoking a pack a day. On the mini-mental status exam, Plaintiff scored 30 out of 30. There was no evidence of a cognitive impairment on mental status examination. Dr. Rizzo recommended an MRI, an EEG, a carotid duplex examination and neuropsychological testing with an MMPI. Tr. at 294. The doctor also recommended that Plaintiff stop smoking and lose weight. Tr. at 295. An MRI of Plaintiff brain taken on February 7, 2000, was within normal limits. Tr. at 310.

Also on January 14, 2000, Plaintiff was seen by Herbert A. Berger, M.D. for a pulmonary evaluation. Tr. at 296–98. Plaintiff had smoked up to two or three packs of cigarettes per day for 40 years. He was smoking again, but reported that he had stopped for a while with the use of Zyban. Plaintiff reported dyspnea with minimal exertion. He told the doctor that he was using three or four nitroglycerins per week to relieve chest pain. The doctor wrote: "On his dyspnea disability scale, he would be considered a class III, i.e., dyspnea with some activities of daily living but can perform without assistance. He is able to walk at his own pace for a city block but cannot keep up while walking with others of his own age." Tr. at 296. After his examination, Dr. Berger wrote that Plaintiff had a history of moderate chronic obstructive pulmonary disease. Plaintiff was encouraged to stop smoking and to begin an exercise program. Tr. at 297.

On February 8, 2000, Plaintiff was seen by a psychologist for a neuropsychological evaluation. This evaluation revealed impaired performance on several tests of cognitive function, however, Plaintiff's behavior suggested less than optimal effort on the tests. The psychologist, Dr. Anderson, wrote: "Overall, psychological factors appear to be making a major contribution to his presentation. In this context, there was no compelling evidence of cognitive impairments which would suggest brain dysfunction, although this cannot be ruled out from the neuropsychological data." Dr. Anderson also wrote that there were several factors which raised the question of a

sleep disorder which may be contributing to Plaintiff's complaints of cognitive and emotional problems. Tr. at 299.

Plaintiff was seen by a nurse in the department of psychiatry at the University of Iowa on February 10, 2000. Plaintiff reported high levels of anxiety including a fear of dying of a heart attack as his brothers had. Plaintiff said that he wanted to go back to work, but was fearful that he would die if he pushed himself too much. The nurse was of the opinion that Plaintiff had anxiety with an overlay of depression for which an evaluation by a psychiatrist was recommended. Tr. at 293.

Plaintiff was seen in the department of psychiatry on February 15, 2000. On Axis I, the doctor's diagnoses were dysthymic disorder, poly-substance dependance in remission, and nicotine dependence. On Axis II, the diagnosis was antisocial personality disorder. The doctor prescribed Zoloft and recommended that Plaintiff follow up at his local mental health center. Tr. at 307.

On February 15, 2000, Plaintiff underwent a psychological evaluation by Valerie J. Keffala, Ph.D., as part of a Rehabilitation Evaluation at the University of Iowa Back Clinic. Tr. at 342–44. Plaintiff reported that he had been hospitalized in 1975, after having been committed by his mother, for drug abuse treatment. He said that he started using drugs and alcohol at the age of 12, but discontinued drinking at age 32 after his brother died of a heart attack which Plaintiff attributed to his brother's drinking. Tr. at 342. Plaintiff continued using other drugs until his heart attack in 1999. When he drank, it was on a daily basis from morning until night. When he used drugs, he said that he used anything that he could get his hands on including marijuana, methamphetamine—which he said was his drug of choice—and heroin. Plaintiff stated that he had been to prison twice, once in Iowa and once in Illinois because of breaking and entering to support his drug habit. The Beck Depression Inventory–II indicated that Plaintiff has severe depressive symptomatology. The test was administered verbally due to Plaintiff's poor reading ability. Tr. at 343. Although Plaintiff attributed concerns about memory and concentration to his heart attack, Dr. Keffala opined that his long term history of drug use had impacted on his cognitive functioning. Dr. Keffala recommended that Plaintiff seek psychotherapy for management of his depressive symptomatology, as well as his memory and concentration. Tr. at 344.

Plaintiff was seen for a cardiac evaluation on February 15, 2000. Tr. at 345–47. This evaluation showed that Plaintiff had the average capacity to work at 3.5 METs, with a range between 2.5 and 5.00 METs. This, according to Rhonda Barr, PT, MA, CCS, who signed the report, was suitable for medium work tasks [6]. Ms. Barr also wrote that Plaintiff would significantly benefit from an increased activity level including a conditioning program to improve his functional strength and endurance. Tr. at 347.

Plaintiff was seen in the pulmonary clinic on March 9, 2000. It was reported that Plaintiff had spent two weeks in a pulmonary rehabilitation program, but that he had not implemented home exercise strategies following the program. Also, Plaintiff had not been able to quit smoking. Plaintiff's exercise tolerance was approximately one to two flights of stairs before he needed to stop because of shortness of breath.

---

**6.** It is not clear whether or not this reference to medium work tasks is synonymous with medium work as defined in 20 C.F.R. § 404.1567.

Tr. at 301. Lois J. Geist, M.D. wrote: "Despite Mr. Horton's age, he has fairly significant end-organ disease as a result of his smoking habit. These include coronary vascular disease and chronic obstructive pulmonary disease." The doctor wrote that Plaintiff's symptoms can be attributed to COPD which had not improved with medication or with the exercise rehabilitation program. "We feel that the most significant contributing factor to Mr. Horton's failure to improve has been his inability to stop smoking. The patient is unlikely to get sustained symptomatic benefit from changes in his current medical regimen unless he stops smoking." Dr. Geist also wrote that Plaintiff was encouraged to resume the same types of exercise at home that he had been taught in the pulmonary rehabilitation program. Tr. at 302.

Plaintiff returned to the University of Iowa Heart Care Center on May 23, 2000, with a complaint of chest pain. Plaintiff described both pressure-like and sharp pain involving the chest wall, both to the left and to the right of the lower sternum. Dr. Felder wrote that Plaintiff was "physically rather active, does a lot of mowing and other upper body activity." Although Plaintiff said that he was short of breath a good part of the time, and that he was unable to manage without the use of inhalers, he also said that he continued to smoke. Plaintiff underwent a treadmill test which was interpreted as non-diagnostic. He had chest pain at the beginning of the test and reported that the pain worsened at the test progressed. No changes, however, were seen on the EKG. Tr. at 353. Because the pain seemed to have its origin in the chest wall rather than the heart, Dr. Felder prescribed Celebrex. Tr. at 354.

On July 5, 2000, in a followup visit to the Low Back Pain Rehabilitation Program at the University of Iowa, Plaintiff stated that his pain continued unchanged. He also said, however, that he was riding his bicycle approximately 4–6 miles a day. Tr. at 358.

Plaintiff was seen at the Department of Internal Medicine at the University of Iowa by Richard LeBlond, M.D. and other doctors in the department on July 13, 2000. Tr. at 364–66. Plaintiff reported continued episodes of sharp substernal chest pain occurring 2–3 times per day. Plaintiff said that he was riding his bicycle 5 to 7 miles per day although he said that he is unable to perform activities of daily living such as mowing the lawn or walking more than a block. Plaintiff also reported sharp, shooting pain in his back. Plaintiff was noted to have a long history of COPD and asthma. Tr. at 364. Dr. LeBlond wrote that Plaintiff was being treated for depression by a psychiatrist outside the University. On physical examination, no abnormalities were noted. Tr. at 365.

Plaintiff was seen in the Pulmonary Disease Clinic at the University of Iowa on July 18, 2000. Plaintiff had reduced his smoking to two or three cigarettes per week and was using nicotine patches. He said that he was riding his bicycle up to three miles without severe difficulty. Plaintiff reported little improvement in episodes of paroxysmal nocturnal dyspnea[7] and reported that he needed to use his albuterol inhaler as many as seven or eight times through the day. After an examination and pulmonary function tests, Gary W. Hunninghake, M.D., wrote: "Mr. Horton continues to have symptoms of

7. acute dyspnea (shortness of breath) appearing suddenly at night, usually waking the patient from sleep; caused by pulmonary congestion with or without pulmonary edema that results from left-sided heart failure following mobilization of fluid from dependent areas after lying down. Stedman's Medical Dictionary, 27th Edition.

shortness of breath and dyspnea on exertion which continued to be out of proportion to the degree of abnormality on his pulmonary function tests." The doctor said that significant and extensive work up, including repeated pulmonary function tests, exercise treadmill tests and coronary catheterizations all reveal stable disease. Because of Plaintiff's reports of problems sleeping, the doctor suggested an overnight polysomnogram to consider the possibility of sleep apnea. In the meantime, Plaintiff was to continue taking his medications as directed and to continue his home exercise program. Tr. at 368.

On August 7, 2000, Dan Fullerton, L.M.S.W. wrote to Plaintiff's attorney that Plaintiff was a patient at the Gannon Center For Community Mental Health. Mr. Fullerton said that Plaintiff's psychiatrist was A. Alberto Sanchez, M.D. (*See* Tr. at 327–29 which is Dr. Sanchez' initial psychiatric evaluation dated April 17, 2000), who was prescribing Zoloft. Mr. Fullerton wrote: "At the present time, Mr. Horton is unable to work because of his depression. His depression is severe enough that he would be unable to follow simple rules effectively and deal with the public effectively at all." Mr. Fullerton went on to relate that one of Plaintiff's symptoms of depression was anger which was being worked on in psychotherapy at the clinic. Tr. at 326.

On August 2, 2000, Ernest M. Found, M.D., from the University of Iowa Department of Orthopaedic Surgery, wrote to Plaintiff's attorney that Plaintiff's permanent lifting restrictions "would involve approximately 45 pounds and repetitive lifts of 22 pounds." The doctor wrote that Plaintiff should limit himself to occasional bending, stooping, and reaching. He said that Plaintiff can stand for up to 30 minutes after which he should sit for 2–3 minutes. After sitting for 30 minutes, he

would need to stand or change position for 1–2 minutes. Tr. at 332.

In a letter dated August 28, 2000, Dr. Felder wrote that although Plaintiff had early coronary artery disease and risk factors for progression of that process, there was no current evidence of active cardiac ischemia, and that the heart disease was not a limiting factor. Dr. Felder wrote that Plaintiff's major physical limitations were his chronic lung disease and his back and leg pain. Tr. at 330. Karl W. Thomas, M.D., of the Department of Internal Medicine at the University of Iowa, wrote to Plaintiff's attorney on January 23, 2001 (Tr. at 373–74), in which he opined, based on pulmonary function studies at the University, that Plaintiff would be limited to sedentary work as defined by the Social Security Administration. Tr. at 374.

On January 10, 2001, Plaintiff's psychiatrist, Dr. Sanchez, filled out a questionnaire regarding Plaintiff's impairments and limitations. Tr. at 380–83. Dr. Sanchez stated that he had seen Plaintiff on six occasions between January 21, and December 15, 2000. Tr. at 382. The doctor's Axis I diagnoses were major depression and anxiety disorder. Tr. at 383. The doctor was asked to rate Plaintiff's impairment in eighteen domains on a scale of none, slight, moderate and marked. None of the domains were noted to be none or slight. A moderate impairment was defined as one which significantly affects, but does not preclude, the ability to function. A marked impairment was defined as one which severely affects ability to function. Tr. at 380. The following domains were listed as having a moderate degree of limitation: The ability to relate to other people; restriction of daily activities; degree of constriction of interests; remember work-like procedures Tr. at 380; understand and remember short and simple instructions; carry out short and simple in-

structions; sustain an ordinary routine without special supervision make simple work-related decisions Tr. at 381; ask simple questions or request assistance; accept instructions and respond appropriately to criticism; get along with co-workers or peers without unduly distracting them or exhibiting behavioral problems; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions Tr. at 382. The following domains were listed as being markedly limited: deterioration of interests Tr. at 380; maintain attention for extended periods (2 hour segments); maintain regular attendance and be punctual within customary tolerance; work in coordination with or proximity to others without being unduly distracted by them; complete a normal workday and workweek without interruptions from medically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 381. The doctor was asked: "Given the patient's present psychiatric symptoms, do you believe that he is capable of engaging in full time or near full time employment at this time." The doctor answered the question: "No." Tr. at 382.

Plaintiff underwent a psychological evaluation by Julian Burn, Ph.D. on February 6, 2001. Plaintiff reported that he had quit school in the 7th or 8th grade. He helped his father doing farm work until he turned 17, at which time he left home to hitchhike around the country. In 1977, Plaintiff was charged with burglary and sentenced to prison until being released in 1987. Thereafter, Plaintiff worked construction. Tr. at 385. While doing construction work, Plaintiff began to drink and use drugs which he continued to do until he had a heart attack. Dr. Burn administered a Wide Range Achievement Test—Revision 3, which showed that Plaintiff functions at the fifth grade level

in reading and spelling, and at the third grade level of math. Tr. at 386.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing before the ALJ on March 20, 2001. Tr. at 32–91. Plaintiff testified that carrying a load of dry laundry causes him to have chest pain. He said that if he begins to think about his situation, the stress brings on shortness of breath and chest pain causing him to use inhalers and nitroglycerin pills. Tr. at 54. Plaintiff said that since his accidents, he has had pain in his back and legs on a continuous basis. Tr. at 56. Plaintiff testified that he sees Mr. Fullerton and Dr. Sanchez at the Gannon mental health center because of his depression. Tr. at 61. When asked about his social life, Plaintiff said that he visits with his sisters and "stay at home and watch TV." Tr. at 62.

After Plaintiff testified, the ALJ called G. Brian Paprocki to testify as a vocational expert. Tr. at 72. The ALJ asked the following hypothetical:

The gentleman has some back problems, at least allegations of back pain, but no orthopedic diagnosis. He definitely has cardiac problems. And he has some medically placed stints. So he has coronary artery disease. He definitely has chronic obstructive pulmonary disease with asthma. And he has again some allegations of depression, mostly situational depression, for which he's at present seeing a counselor. In terms of his combined problems and no doubt about it, they are severe. And I will be even more conservative than the University of Iowa who said he could lift 45 pounds and 22 pounds, and limit him to occasional lifting of 20 pounds and frequent lifting of 10 pounds. There—he does bike ride. And he bike rides during the

summer months. He has not stopped smoking. And was smoking right through the year 2000. And the doctor felt that that impeded his progress. So he's kind of deconditioned. But he should be able to sit, stand and walk with normal breaks during an eight-hour day. With the exception that because of his chronic obstructive pulmonary disease and asthma, physical activities should probably be performed in climate controlled environments. In terms of his allegations of depression, basically they are mild in that they do not, more than mildly interfere with his ability to function independently, appropriately and effectively on a sustained basis. For purposes then of that hypothetical, would he be able to do any of his past work activity?

Tr. at 50. In response, the vocational expert testified that Plaintiff would be able to do no more than light, unskilled work. Tr. at 81. The vocational expert testified that there would be unskilled light and sedentary jobs that would meet the restrictions of the hypothetical. Examples were various assembly jobs such as toy assembler, fishing rod assembler, administrative support jobs such as putting pre-printed labels onto envelopes for mass mailings, and document preparer. Tr. at 82. In response to questions from Plaintiff's attorney, the vocational expert said that if Plaintiff needed to take a few minute break after standing for 30 minutes, he would be limited to sedentary work. Tr. at 84–85. When presented with the limitations identified by Dr. Sanchez, the vocational expert testified that competitive work would be precluded. Tr. at 89–90.

### ADMINISTRATIVE DECISION

In her decision dated June 20, 2001, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time after the alleged onset of disability date. At the second step, she found that Plaintiff's severe impairments are heart problems, chronic obstructive pulmonary disease, minimal low back pain. The ALJ found that Plaintiff's depression was not severe and that it caused mild restriction of activities of daily living, mild difficulty maintaining social functioning, mild difficulty maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. At the third step, the ALJ found that none of Plaintiff's severe impairments meet or equal any listed in Appendix I, Subpart P, Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is unable to perform his past relevant work. At the fifth step of the sequential evaluation, the ALJ found Plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently in a controlled environment work setting. Tr. at 20. The ALJ found that Plaintiff is able to do the type of work identified by the vocational expert. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 21.

### DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*,

87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

■ In the case before the Court, the ALJ found that Plaintiff is unable to do any of his past relevant work. The burden of proof, therefore, shifted to the Commissioner to prove that Plaintiff retains the residual functional capacity to perform other work as well as proving that other work exists in significant numbers in the national economy that can be done by a person with such a residual functional capacity. *Shontos v. Barnhart,* 328 F.3d 418 (8th Cir.2003); *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982) (en banc); *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000).

■ In the case at bar, the ALJ found that Plaintiff has a physical residual functional capacity for lifting 20 pounds occasionally, and 10 pounds frequently as long as the work is done in a clean environment. Plaintiff argues that the ALJ erred by rejecting medical opinion that Plaintiff is limited to sedentary work. Although the residual functional capacity finding must be supported by some medical evidence, the ALJ is to base the finding on all the evidence in the record. While it's true that Plaintiff was limited to sedentary work by the pulmonologist, and the orthopedic doctor opined that he would need to change positions after periods of sitting or

standing, there is substantial evidence that Plaintiff was doing physical activity, including cutting brush, lawn mowing, and bicycle riding. There is also evidence in the record that if Plaintiff would discontinue smoking and continue with his exercise program his physical endurance would improve. The ALJ's finding in this regard, therefore, is supported by substantial evidence.

■ On the other hand, the ALJ's finding that Plaintiff has only a mild, situational depression which imposes no limitations, is not supported by any substantial evidence in the record. The experts on this question are the psychologists and psychiatrist who have treated and examined Plaintiff. *Wilder v. Chater,* 64 F.3d 335, 337, (7th Cir.1995) (psychiatrists, not lawyers or judges are the experts on mental illness). Dr. Felder noted that Plaintiff appeared to be depressed. When Plaintiff was seen by Valerie J. Keffala, Ph.D., she observed that Plaintiff was depressed and she recommended that he seek psychotherapy. Tr. at 344. A psychiatrist at the University of Iowa saw Plaintiff and prescribed medication and recommended that Plaintiff seek ongoing care in his home town. Plaintiff sought mental health care at the Gannon Mental Health Center. Mr. Fullerton, on behalf of the Center, wrote that Plaintiff was unable to work because his depression is severe enough that he was unable to follow simple rules effectively and deal with the public at all. Tr. at 326. Dr. Sanchez, Plaintiff's psychiatrist, opined that Plaintiff was markedly limited in several significant domains, including his ability to complete a normal work day or work week. Tr. at 380–83.

Perhaps the most insightful view of Plaintiff's mental status was provided by Julian M. Burn, Ph.D., who saw Plaintiff in 2001. Dr. Burn tells us that Plaintiff is a man who dropped out of school in the 7th or 8th grade. He is able to read and spell

at the 5th grade level, and do math at the 3rd grade level. Plaintiff spent 11 years of his adult life in prison. After getting out of prison, Plaintiff worked at several construction jobs most of which were of short duration. While doing that work he engaged in drug and alcohol abuse on a continuous basis until he had his heart attack which resulted in three heart surgeries. There is no evidence that Plaintiff was drinking or using drugs after his heart attack. Although Plaintiff tried to do various types of work activity after the heart attack, he testified at the hearing and reported to several doctors that he did not have the stamina to continue. Dr. Burn reported that Plaintiff spent most of his time trying to help his sister around her house. The ALJ found that Plaintiff had not engaged in substantial gainful activity after the alleged onset date of disability.

The Court has unsuccessfully searched the record for some substantial evidence that Plaintiff has the mental ability to function in competitive work activity. *Thomas v. Sullivan*, 876 F.2d 666, 669, (8th Cir.1989), citing *McCoy v. Schweiker*, 683 F.2d at 1147 (the residual functional capacity which must be found is the ability to work day in and day out in the sometimes competitive and stressful conditions in which real people work in the real world). The Court of Appeals has held many times, most recently in the *Shontos* case, that an ALJ is not permitted to draw his or her own inferences from the medical evidence. *Shontos* at 427, citing *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975). In *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir.1974), the Court, Judge Lay, stated that it might be advisable for the Secretary to submit a short set of interrogatories, such as those submitted by Dr. Sanchez, to examining physicians on which the doctor could "not only to set forth his full detailed opinion as to the extent of disability but also whether in his opinion the claimant was disabled from

pursuing substantial gainful activity…" Judge Lay went on to remind the Secretary, now the Commissioner, and reviewing courts that: "The right to disability payments is a significant one to the applicant; it may well constitute the only ray of hope left to him." *Id.*

█ The vocational expert testified that if the limitations identified by Dr. Sanchez were taken into account, competitive work would not be possible. It is well settled that for vocational expert testimony to constitute substantial evidence, it must be based on hypothetical questions that relate with precision the physical *and* mental impairments of the claimant. *Ness v. Sullivan*, 904 F.2d 432, 436 (8th Cir.1990). The testimony of the vocational expert in response to the ALJ's hypothetical which assumed that Plaintiff's mental impairments were mild with no restrictions is not substantial evidence. The findings that Plaintiff has a residual functional capacity for work and that other work exists that Plaintiff can perform, therefore, is not supported by substantial evidence on the record as a whole. However, because there is already expert testimony that the limitations imposed by Plaintiff's depression would eliminate competitive work, there is no need to remand for any purpose other than to award Plaintiff the benefits to which he is entitled. *Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir.2001) (Because the vocational expert later testified that there would be no work if claimant needed to lie down, it was not necessary to remand for further proceedings other than to award benefits.) The Commissioner did not meet her burden on either prong of step 5 of the sequential evaluation. Plaintiff, on the other hand, came forward with substantial evidence in support of his claim of benefits.

## CONCLUSION AND DECISION

█ It is the holding of this Court that Commissioner's decision is not supported

by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.