# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2210

_____

Elmer D. Muncy,                           *
                                          *
            Appellant,                    *
                                          *        Appeal from the United States
      vs.                                 *        District Court for the Western
                                          *        District of Missouri
Kenneth S. Apfel,                         *
Commissioner of Social Security,          *
                                          *
            Appellee.                     *


_____

Submitted: January 11, 2001
            Filed: April 12, 2001 (Corrected Opinion 4/19/01)

_____

Before LOKEN and BYE, Circuit Judges, and BATAILLON,[1] District Judge.

_____

BATAILLON, District Judge.

      Elmer Muncy was originally awarded disability benefits under Title II of the
Social Security Act, 42 U.S.C. § 401 _et seq._, in July 1987 and supplemental disability
benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 _et seq._, in June
1988. Muncy now appeals the judgment of the district court affirming the final
decision of the Commissioner of Social Security discontinuing his benefits.

_____

      [1]The Honorable Joseph F. Bataillon, United States District Judge for the
District of Nebraska, sitting by designation.

Our review is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, that is, evidence that reasonable minds would accept as adequate to support the Commissioner's conclusion. 42 U.S.C. §§ 405(g), 1382 (c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Holz v. Apfel*, 191 F.3d 945, 947 (8th Cir. 1999). The review is more than "a search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). In determining substantiality, the court must also balance the weight of evidence that detracts from the Commissioner's decision. Because of the insufficiency of the record with regard to Muncy's mental status, we must remand this matter to the Commissioner for further proceedings.

## I. Background
### A. Medical Record

Muncy was forty-one at the time of the hearing before the administrative law judge (ALJ) in April 1997. He is functionally illiterate, although he finished tenth grade in special education classes. He worked a series of hard physical labor jobs until 1986 when he suffered a heat stroke while working as an oil field roustabout. He tried several other jobs, but found that he had developed severe heat intolerance. The medical records do not reveal an exact cause for the heat intolerance.

The medical records do show, however, that Muncy has several health problems apart from heat intolerance, including obesity; hypertension; spinal arthritis; a small herniated disk at the L5-S1 level; a pinched nerve; headaches; and chronic sinusitis, sore throats, and earaches. In addition, he claims significant pain on the left side of his body as a result of an accident in 1991 when he fell through the rotting floor of his Housing Authority apartment. He alleges that he has experienced pain, periodic numbness, spasms, and swelling in various parts of the left side of his body since the accident, along with chronic neck, buttock, lower back, and leg pain.

In 1993, a neurosurgeon discovered that the calf of Muncy's left leg had atrophied one inch and that he had sensory hypalgesia along the L4 dermatome down the calf into the big toe, likely caused by the piriform muscle compressing the perineal portion of the sciatic nerve. Also in 1993, a neurologist diagnosed headaches and neck pain resulting from the 1991 injury. Nerve conduction studies showed a slight prolongation of the ulnar distal motor latency, suggesting a mild ulnar neuropathy. An MRI of Muncy's cervical spine showed a mid-thoracic vertebral lesion.

In 1996, another neurosurgeon found some limitation of motion in Muncy's neck and low back with spasms in the low back on both sides. Grip strength was 240 on the dominant right hand and 80 on the left. The doctor found numbness in the entire left hand and left foot. He diagnosed chronic cervical and lumbrosacral arthritis, by history; chronic cervical strain; chronic lumbrosacral strain; small, central, herniated lumbar disc; and cerebral concussion, Grade I, by history. The doctor said that Muncy could lift twenty pounds occasionally, and could sit no more than thirty minutes at a time and no more than six hours a day.

More than one doctor, however, has suggested that Muncy demonstrates drug-seeking behavior and questioned his attempts to procure pain medications. The neurologist whom Muncy saw in 1993 questioned why Muncy continued to complain of such significant pain, and wondered if "there is some secondary gain associated with these complaints." Administrative Record (AR) 340.

B. Mental Status

Muncy's mental status is of primary concern in this appeal. During his initial benefit determination in 1988, a psychologist found that on the WAIS-R Muncy's full scale IQ was 59, verbal IQ was 57, and performance IQ was 64, placing him in the mild range of retardation. That result qualified him for benefits under the section

12.05(B) listing for mental retardation. Section 12.05(B) requires a "valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

During the continuing disability review in 1994, however, another psychologist, Dr. Stevens, tested Muncy and found that on the WAIS-R, his full scale IQ was 84, verbal IQ was 84, and performance IQ was 84. An IQ of 84 placed him in the low normal range, described by "borderline intellectual functioning." *Holz v. Apfel*, 191 F.3d 945, 947 (8th Cir. 1999); *Thomas v. Sullivan*, 876 F.2d 666, 668 n.1 (8th Cir. 1989).

In his report, Dr. Stevens also noted that he had difficulty "communicat[ing] concepts to [Muncy] as he has difficulty listening." Dr. Stevens found that Muncy had a second grade reading and spelling level and a third grade arithmetic level. The results of the short form MMPI suggested "some schizoid personality traits in an individual who has some periodic situational depression and preoccupation with his condition, referred to as psychological factors affecting physical condition. This represents some emotional distress but is not at a severe level." AR 308. Muncy did not score well on work simulation testing. On the Crawford Small Parts Dexterity Test, Muncy placed in the fourth percentile on Part I and in the third percentile on Part II. Muncy could not complete the twenty-minute Valpar Simulated Assembly Work Sample because pain in his back left him stooping, holding onto the table, after only about five minutes.

Dr. Stevens concluded that before Muncy's 1991 accident, "he had some remaining vocational and earnings potentials, but the injury to his back has removed these potentials and he can now look forward to a life of chronic discomfort and feelings of uselessness. Thus, the prognosis is poor and I expect limited change in the foreseeable future." *Id*.

## C. Hearing Testimony

Muncy testified at the hearing before the ALJ, along with his wife and his half-brother. Muncy said that his pain was worsening in his mid to upper back, neck, left leg, and left arm, and that his left leg and arm were also numb. Standing and sitting aggravated the pain. He said that he spends all day watching TV, occasionally stepping out on his porch for fresh air. He drives his wife to and from work each day and grocery shops once a week. He said he could sit ten minutes; stand five to ten minutes; walk two blocks, such as a couple of times around a large discount store; and lift a gallon of milk with his right arm. He uses a cane unless his left wrist and arm spasm. He said he could not bend, twist, or crawl.

Muncy's wife of nineteen years noted that Muncy cannot read or write or take care of the checkbook or their finances. In fact, she filled out all the Social Security applications and forms included in the Administrative Record. She says that he has trouble understanding what is read to him and concentrating on what is said to him. She testified that Muncy has "heat strokes," during which his face turns white, his voice changes, and he trembles. She also testified that she knows Muncy is in nearly constant pain by the tearing in his eyes.

## D. ALJ's Decision

The ALJ found that 1) Muncy's cervical and lumbar strain was severe enough to reduce his ability to work, but not severe enough to meet or equal the criteria of any impairment in the listings; 2) Muncy's new IQ score of 84 took him outside the criteria of section 12.05(B) of the listings[2]; 3) Muncy experienced medical

---

[2]The Social Security regulation in effect at the time of the ALJ's decision provided that any IQ over 80 was classified as a non-severe impairment. *See* Soc. Sec. Ruling 82-54. In addition, Muncy's new IQ of 84 disqualified him for benefits under two other sections of 12.05, since those sections apply only to claimants with IQs of 60 through 70. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05(C) and (D).

improvement related to his ability to work and, as of January 1, 1996, had the residual functional capacity to perform a full range of light work, despite his illiteracy; 4) other than exertional impairments caused by his cervical and lumbar strain, Muncy had no additional nonexertional impairments to reduce the light work base; 5) occupations existed in the national and regional economies in significant numbers that Muncy could perform regardless of his impairments; and 6) while Muncy's impairments and residual functional capacity precluded him from performing his past relevant work, he was no longer disabled as of January 1, 1996. AR 17-18.

The ALJ discredited Muncy's allegations of pain because they were not based on the objective findings by treating and examining physicians, because Muncy sought medical treatment only sporadically and was not taking any pain medication, and because Muncy did not evidence discomfort during the hearing. The ALJ also noted that the medical records did not mention heat exhaustion except as a historical incident or muscular weakness. Further, the medical records showed no basis for a claim of nerve involvement related to Muncy's neck or left arm. The ALJ specifically discounted the large discrepancy in grip strength between Muncy's two hands as the result of Muncy's right-handedness, but he nowhere acknowledged the one-inch atrophy in Muncy's left calf. The ALJ noted that one of Muncy's physicians wrote that Muncy could perform significant work-related activities, but the ALJ specifically discounted the disability applications completed by Muncy's orthopedic surgeon as inconsistent with the remainder of the medical record and with his own medical notes.

In addition, the ALJ gave minimal weight to the limitations Dr. Stevens assessed in Muncy's ability to perform mental work-related activities because "Dr. Stevens relied on [Muncy's] statements which have no credibility and the testing he performed which showed no problems at a severe level." AR 15. Dr. Stevens had written that Muncy had an Axis I diagnosis of pain disorder due to general medical condition, and had ranked Muncy as "poor" on his ability to maintain attention and concentration on the job; to understand, remember, and carry out complex job instructions; or to demonstrate reliability. Dr. Stevens had ranked Muncy as "fair" on

his ability to deal with the public or with work stresses and to understand, remember, and carry out detailed, but not complex, job instructions. AR 418-19.

The ALJ did not offer the testimony of a vocational expert, instead applying Rule 202.16 of the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, Reg. 4.

## II. Discussion
### A. IQ Scores

An ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior. *Clark v. Apfel*, 141 F.3d 1253, 1255-56 (8th Cir. 1998). The Social Security regulations do not specify, however, which score the ALJ should disregard when there are differing scores from two apparently valid IQ tests. The issue here is whether the ALJ correctly disregarded the IQ score from a one-time examination by a non-treating psychologist apparently only because it is older – and significantly lower – than a later second score.

At least one court has suggested that the regulations require the ALJ to reach the opposite conclusion in this situation, rejecting the higher score. *See Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal. 1996). In *Ray*, the claimant had two IQ scores: a 72 on a 1993 test and a 67 on a 1995 test. The ALJ relied on the higher score with the result the claimant could not qualify for benefits under section 12.05(D). The Social Security regulations provide, however, that when more than one IQ score is reached from the test administered, such as the verbal, performance, and full scale IQs obtained from the tests in the Weschler series that Dr. Stevens used in this case, the Commissioner must use "the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D). The *Ray* court observed that this regulation might create an inference that "when multiple I.Q. scores are available [from IQ tests administered a different times,] the Regulations prefer the lowest score," 934 F. Supp.

at 350, and remanded to the Commissioner for further development of the record with regard to the claimant's mental condition.

The ALJ here neither addressed the discrepancy between Muncy's two IQ scores nor discussed what factors called into question the first score's validity. Instead, the ALJ apparently accepted the validity of the second test over the first and attributed the twenty-five point increase in Muncy's IQ to "medical improvement." To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must "demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work." *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991) (*citing* 20 C. F. R. § 404.1594(b)(2)-(5)). Whether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility. *Id*. at 1316.

The regulations define mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" before age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Mental retardation is not normally a condition that improves as an affected person ages. It is highly unlikely that an adult could gain twenty-five IQ points – a 42% increase – in six years.

Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning. *See, e.g., Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) (absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); *Guzman v. Bowen*, 801F.2d 273, 275 (7th Cir. 1986) (claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); *Luckey v. Department of Health & Human Servs.*, 890 F.2d 666, 668-69 (4th Cir. 1989) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); *Holmes v. Apfel*,

1999 WL 731769, \*5 (N.D. Ill. 1999) (IQ score presumptively reflects person's IQ throughout life, no matter how old the person was when test first administered); *Ouellette v. Apfel*, 2000 WL 1771122, \*3 (D. Me. 2000) (absent contrary evidence, "a person's IQ and/or the condition of mental retardation is presumed to have been approximately constant throughout his/her life"). *See also Sird v. Chater*, 105 F.3d 401, 402 n.4 (8th Cir. 1997). The ALJ here cited no evidence demonstrating a dramatic upswing in Muncy's intellectual or adaptive functioning between 1988 and 1994, other than the higher second IQ score. Nor did the ALJ challenge the validity of the first IQ score as inconsistent with other evidence in the record. Muncy remains unable to read, write, manage his finances, or even fill out Social Security applications. He thus still appears to be dependent on his wife for many activities of daily living.

We therefore must remand this matter to the Commissioner for further analysis to resolve the twenty-five point discrepancy between Muncy's two IQ scores. The Commissioner is directed to enter specific findings detailing why Muncy's first IQ score should not be adopted as the controlling score. Should the Commissioner find after further analysis that Muncy's second IQ score is in fact the controlling score, the Commissioner is further directed to consider the effect of Muncy's borderline intellectual functioning as discussed in the following section.

## B. Use of Guidelines

The ALJ found that Muncy's exertional impairments of cervical and lumbar strain limited Muncy to performing a full range of light work. The ALJ also found that given Muncy's "medical improvement," i.e., the twenty-five point increase in his WAIS-R IQ scores, Muncy had no additional nonexertional impairments to further reduce his work base. As a consequence, the ALJ did not use the testimony of a vocational expert, relying instead on Rule 202.16 of the medical-vocational guidelines. AR 16-17. Muncy argues that his nonexertional impairments of pain,

muscle atrophy, neuropathy, and borderline intellectual functioning required the ALJ to hear testimony from a vocational expert rather than relying on the guidelines.

Using the guidelines, an ALJ may find a claimant not disabled

if the claimant does not have nonexertional impairments, or if the nonexertional impairment does not diminish the claimant's RFC to perform the full range of activities listed in the guidelines. If the nonexertional impairments significantly affect the RFC, however, the guidelines are not controlling and may not be used to direct a conclusion of not disabled. 'Adequate training and intellectual capacity are presumed in the [g]uidelines and evidence that militates against those presumptions makes the [g]uidelines inapplicable.'

*Holz v. Apfel*, 191 F.3d at 947 (citations omitted) (alterations in original). The issue here, then, is whether the ALJ properly found that Muncy had no nonexertional impairments. To resolve the issue, we remand the matter to the Commissioner for further findings consistent with this opinion.

Even assuming that Muncy's IQ score of 84 is valid, it nevertheless represents borderline intellectual functioning. *Thomas v. Sullivan*, 876 F.2d at 668 n.1. Such a score indicates a "significant nonexertional impairment that needed to be considered by the VE." *Holz v. Apfel*, 191 F.3d at 947 *(citing Foreman v. Callahan*, 122 F.3d 24, 26 (8th Cir. 1997); *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir. 1997)). Consequently, further proceedings are needed to determine the effect of Muncy's borderline intellectual functioning. From the evidence developed thus far, it appears that Muncy is illiterate, cannot write or manage his own finances, cannot perform his past relevant work, has no relevant skills, and is physically limited to light work. On remand, the Commissioner is directed to consider whether the guidelines suggest a finding of disability in the particular circumstances of this case.

A question also exists about whether the ALJ properly discredited Muncy's subjective complaints of pain when determining that Muncy had no nonexertional impairments. The ALJ stated that Muncy's claims were not credible because the record lacked objective medical findings by treating and examining physicians and because Muncy did not take pain medication, frequent doctors' offices, or exhibit discomfort at the thirty-six minute hearing.

The medical record, however, does not appear to support these findings. Muncy saw doctors regularly after his 1991 accident; several of these doctors prescribed narcotic pain relievers or muscle relaxants for his pain. Moreover, the record objectively reports that Muncy's left calf has atrophied a full inch, that his grip strength varies markedly between his hands, and that he experiences neuropathy in his left hand and leg. In addition, Muncy's failure to "sit and squirm" with pain during the hearing cannot be dispositive of his credibility. *See Miller v. Sullivan*, 953 F.2d at 422 (observing that a claimant's appearance and demeanor at the hearing can be deceiving).

We therefore direct the Commissioner also to reconsider on remand Muncy's credibility with respect to his subjective complaints of pain , using the familiar factors found in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

## III. Conclusion

Accordingly, the judgment of the District Court is reversed, and the cause remanded to that court with instructions to remand the matter to the Commissioner of the Social Security Administration for further proceedings in light of this opinion.

A true copy.
　　Attest:


　　　　　CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.