# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 12-3265

———————————————

Gary Phillips

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Acting Commissioner, Social Security Administration

*Defendants - Appellees*

————————

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

————————

Submitted: March 15, 2013
Filed: July 25, 2013

————————

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

————————

SMITH, Circuit Judge.

The Social Security Administration (SSA) redetermined Gary Phillips's eligibility for supplemental security income (SSI) benefits and concluded that he was no longer eligible to receive them. The Administrative Law Judge (ALJ) concluded that Phillips's disability ended on February 1, 2008. Phillips exhausted his

administrative remedies and then sought review in the district court,[1] which affirmed the ALJ. Phillips now appeals, arguing that the district court erred in finding substantial evidence to support the ALJ's decision that his condition does not meet or medically equal Listing 12.05C for mental retardation. We affirm.

## I. *Background*

In 1995, at the age of five, a psychometric evaluation determined that Phillips's "overall level of intellectual functioning is in the mild range of retardation," with a verbal IQ of 55, a performance IQ of 63, and a full-scale IQ of 56. The SSA approved Phillips for SSI benefits. Over the next 11 years, Phillips's evaluations consistently indicated IQ scores in the 50s and 60s. In November 2006, the licensed psychological examiner for Phillips's high school, Joan Jeffrey, evaluated Phillips and determined that he had a verbal IQ of 66, a performance IQ of 69, and a full-scale IQ of 64.

Phillips turned 18 in August 2007, thus triggering SSA redetermination of his disability claim. *See* 42 U.S.C. § 1382c(a)(3)(H)(iii). In January 2008, a consultative psychologist, Dr. Don Birmingham, evaluated Phillips on behalf of the SSA, concluding that Phillips's verbal IQ was 74, his performance IQ was 74, and his full-scale IQ was 72. Dr. Birmingham noted that Phillips appeared to be capable of semi-independent living and was capable of understanding, carrying out, and remembering instructions and responding appropriately to supervisors, co-workers, and work pressure in a simple work setting. Subsequently, the Commissioner determined that Phillips's disability had ended on February 1, 2008.

Phillips requested a hearing before an ALJ. The ALJ conducted the hearing and directed that Phillips receive further psychological testing. Another psychologist, Dr. Kenneth Hobby, evaluated Phillips twice, in June and October 2010. Dr. Hobby

[1]The Honorable Jerome T. Kearney, United States Magistrate Judge for the Eastern District of Arkansas.

administered IQ testing, which concluded that Phillips's verbal IQ was 71, his performance IQ was 81, and his full-scale IQ was 74. Dr. Hobby diagnosed Phillips with ADHD, a learning disorder, and borderline intellectual functioning. He concluded that Phillips appeared to have the intellectual ability to learn simple repetitive and semi-skilled, work-like tasks and that Phillips responded well to supervision and instructions. Consequently, he stated that Phillips would require close supervision until he adequately learned a task, but thereafter, he could function well with minimal supervision.

Based on Dr. Hobby's evaluations, the ALJ found that Phillips failed to satisfy the criteria for disability. Specifically, the ALJ found that Phillips did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ found that Phillips had the ability to perform a full range of work, with the only limitation being that he was functionally illiterate and could perform only simple jobs. The ALJ further found that there are jobs in the national economy that Phillips could perform. The ALJ concluded that Phillips's disability ended on February 1, 2008, and that he had not become disabled again since that date. Consequently, the ALJ determined that Phillips was not eligible for SSI benefits. The Appeals Council subsequently denied Phillips's request for review.

Phillips filed an action in the district court, seeking review of the ALJ's denial of SSI benefits. *Phillips v. Astrue*, No. 4:11-CV-633-JTK, 2012 WL 3903473 (E.D. Ark. Sept. 7, 2012). The court affirmed, finding that substantial evidence on the record as a whole supports the ALJ's decision. *Id.* at *2.

II. *Discussion*

On appeal, Phillips argues that the district court erred in finding substantial evidence on the record as a whole to support the ALJ's decision that his condition does not meet or medically equal Listing 12.05C for mental retardation.

In this social security case, where the Appeals Council denied further review, the ALJ's decision is deemed the final decision of the Commissioner. *Davidson v. Astrue*, 501 F.3d 987, 989 (8th Cir. 2007). We review de novo the magistrate judge's decision upholding the Commissioner's denial of disability benefits. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010). We will affirm the Commissioner's decision if supported by substantial evidence on the record as a whole. *Id.* Substantial evidence is "less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (alteration in original) (quotation omitted). In evaluating for substantial evidence, we "consider the evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Id.* (quotation omitted). If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions, we must affirm. *Id.*

*Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (alteration in original).

A. *Listing 12.05C*

The Commissioner has established a five-step "'sequential evaluation process'" for determining whether an individual is disabled. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)). As relevant here, an individual may be considered for mental retardation under Listing 12.05C at step three of the evaluation process.

This court has interpreted Listing 12.05C to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

-4-

*McNamara v. Astrue*, 590 F.3d 607, 610–11 (8th Cir. 2010); *see also* 20 C.F.R. § 404, Subp. P, App. 1, § 12.05D. It is undisputed that Phillips meets the second element. On appeal, Phillips argues that his condition also meets the first and third elements.

Phillips argues that he meets the first element of Listing 12.05C—having "a valid verbal, performance, or full scale IQ score of 60 through 70." *McNamara*, 590 F.3d at 611. Phillips contends that his verbal IQ score of 66, his performance IQ score of 69, and full-scale IQ score of 64 from the 2006 evaluation are valid and fall within the "60 through 70" range. *See id.* Phillips argues that the ALJ erred by failing to credit the 2006 evaluation and by failing to resolve the discrepancy between the results of the 2006 and the 2010 evaluations.

> [A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning. *See, e.g., Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) (absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); *Luckey v. Department of Health & Human Servs.*, 890 F.2d 666, 668–69 (4th Cir. 1989) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); *Holmes v. Apfel*, 1999 WL 731769, *5 (N.D. Ill. 1999) (IQ score presumptively reflects person's IQ throughout life, no matter how old the person was when test first administered); *Ouellette v. Apfel*, 2000 WL 1771122, *3 (D. Me. 2000) (absent contrary evidence, "a person's IQ and/or the condition of mental retardation is presumed to have been approximately constant throughout his/her life"). *See also Sird v. Chater,* 105 F.3d 401, 402 n.4 (8th Cir. 1997).

*Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001).

> To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must "demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the [mental] condition is related to claimant's ability to work." *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991) (*citing* 20 C.F.R. § 404.1594(b)(2)–(5)). Whether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility. *Id.* at 1316.

*Id.*

The district court found:

> The presumption of a stable IQ may be rebutted by "evidence of a change in a claimant's intellectual functioning." In this case, the record included evidence of a change in Phillips's intellectual functioning. . . . The latter scores—Phillips's adult scores—are higher than the childhood scores. The difference in scores evidences a change in intellectual functioning.

*Phillips*, 2012 WL 3903473, at *4 (citing *Muncy*, 247 F.3d at 734) (footnote omitted). Phillips argues that "this is the very argument that *Muncy* rejected: the evidence demonstrating a dramatic upswing in a claimaint's intellectual or adaptive functioning cannot be the IQ scores alone." In *Muncy*, a 1988 evaluation determined that the claimant had a verbal IQ of 57, a performance IQ of 64, and a full-scale IQ of 59. 247 F.3d at 731. The claimant qualified for benefits under Listing 12.05B. *Id.* (citing 20 C.F.R. § 404 Subpt. P, App. 1). However, pursuant to a subsequent review of the claimant's disability claim, a 1994 evaluation determined that he had a verbal IQ of 84, a performance IQ of 84, and a full-scale IQ of 84, thus placing him into the "borderline intellectual functioning" range and disqualifying him for benefits under Listing 12.05B. *Id.* On review, we found that the ALJ erred by "neither address[ing]

-6-

the discrepancy between [the claimant's] two IQ scores nor discuss[ing] what factors called into question the first score's validity. Instead, the ALJ apparently accepted the validity of the second test over the first and attributed the twenty-five point increase in the claimant's IQ to 'medical improvement.'" *Id.* at 734. We noted that "[m]ental retardation is not normally a condition that improves as an affected person ages. It is highly unlikely that an adult could gain twenty-five IQ points—a 42% increase—in six years." *Id.* Consequently, we "remand[ed] th[e] matter to the Commissioner for further analysis to resolve the twenty-five point discrepancy between [the claimant's] two IQ scores[,] . . . . direct[ing] [the Commissioner] to enter specific findings detailing why [the claimant's] first IQ score should not be adopted as the controlling score." *Id.* at 735.

*Muncy* is distinguishable. First, the largest discrepancy in Phillips's 2006 and 2010 scores is 12 points, less than half of the "twenty-five point discrepancy" in *Muncy*. *See id.* Second, unlike *Muncy*, here the ALJ *did* address the discrepancy. The ALJ's decision stated that Phillips's

> most recent IQ assessment established that [he] had a verbal score of 71, a performance score of 81, and a full-scale score of 74. The undersigned acknowledges that [Phillips] had lower scores in 2006, but th[at] examination was not conducted by a psychologist, and is over four-years old. The 2010 assessment of [Phillips's] intellectual ability is more accurate and consistent with [his] daily activities.

Thus, the ALJ supported its finding that the 2010 results were "more accurate" than the 2006 results with two reasons: the 2006 evaluation was not conducted by a psychologist and its results are four years older.

Jeffrey, Phillips's school psychological examiner, conducted Phillips's November 2006 evaluation. As the ALJ noted, Jeffrey is not a psychologist, but she is a licensed psychological examiner. Neither the ALJ nor the parties cite any

-7-

authority suggesting that IQ scores obtained through evaluations conducted by a psychologist have greater accuracy than those obtained through evaluations conducted by a licensed psychological examiner. Rather, relevant SSA regulations provide:

> (a) Sources who can provide evidence to establish an impairment. We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). See § 416.908. Acceptable medical sources are—
>
> * * *
>
> (2) Licensed or certified psychologists. *Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting*, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only . . . .

20 C.F.R. § 416.913(a)(2) (emphasis added); *see also id.* at § 404.1513(a)(2). Jeffrey's evaluation thus would be an "acceptable medical source[] [for] establish[ing] whether [Phillips] ha[s] a medically determinable impairment(s)." *See* 20 C.F.R. § 416.913(a). Furthermore, an SSA regulation defines a "qualified" evaluator as a "specialist [who is] currently licensed or certified in the State to administer, score, and interpret psychological tests and have the training and experience to perform the test." 20 C.F.R. § 404, Subp. P, App. 1, § 112.00D.6. As a licensed psychological examiner with many years of experience, Jeffrey was "qualified" to conduct Phillips's examination. *See id.*; *see also* the requirements for licensure as a psychological examiner as set forth in Ark. Code Ann. § 17-97-303 and Arkansas Psychology Board Rules and Regulations § 5.3. Finally, Jeffrey's report cannot be faulted for failing to take into account the potential effects of malingering. In a section of the report titled "Testing Behaviors," Jeffrey observed that "[Phillips] was cooperative during the evaluation. . . . He seemed to be putting forth his best effort on all tasks. . . . Test

results are believed to be an accurate reflection of [Phillips's] current level of functioning."

Addressing the four-year lapse of time since the 2006 evaluation, Phillips argues that his IQ scores remain valid because Jeffrey conducted the evaluation when he was 17-years-old. Phillips cites a portion of the SSA regulations pertaining to the documentation of mental impairments, which provides, "Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior." 20 C.F.R. § 404, Subp. P, App. 1, § 112.00D.10.[2] Phillips thus argues that his IQ scores from the 2006 evaluation "are compatible with [his] current behavior" as reported in the evaluations of Dr. Birmingham and Dr. Hobby,[3] and hence that those "results . . . should be viewed as a valid indication of [his] current status." *See id.*

Addressing Phillips's day-to-day functioning, Dr. Birmingham's 2008 evaluation reported:

> [Phillips] has recently obtained his driver's license and is beginning to practice for independent driving. He is independent in most activities in daily living. He reports to me that he handles his medications independently. He also is able to perform most activities in

---

[2]Phillips's reliance on § 112.00D.10 is questionable at best because it is located in Part B of Appendix 1, which deals exclusively with "[m]edical criteria for the evaluation of impairments of children under age 18." *Id.* § 404 Subp. P, App. 1, Part B.

[3]Phillips argues that the ALJ's determination that he suffers from "borderline intellectual functioning" misrepresents what a mildly mentally retarded person is capable of doing. He maintains that a mildly mentally retarded person can care for himself to some degree, have friends, perform basic household duties, live independently, and even learn to perform some work-like tasks.

the home, including light meal preparation. He is able to only add and subtract arithmetic at an elementary level and fails on more complex arithmetic problems and would need assistance in handling his financial affairs. He is socially active and has friends. He has the general capacity to perform most activities in daily living autonomously. He is capable of semi-independent living.

Addressing the level of assistance Phillips needs for "activities of daily living," Dr. Hobby's 2010 evaluation reported:

> In regard to an independent level of feeding himself, bathing, self-care, personal hygiene, and dressing, [Phillips] reports that he needs help with no areas. He reports that his diet normally consists of a variety of foods. He is able to cook, but he burns food. He can plan and prepare meals that do not involve cooking (e.g. soups, warming foods, and sandwiches). There seems to be an adequate level of cooperation with medical advice. He reports not being able to take his medications without help and his grandparents have to monitor his medications because he forgets to take them. He is able to engage in leisure activities including: his friend takes him to the skating rink. He reported doing the following household chores autonomously: [a]ny on a daily basis, except work out in the heat. Dangerous behaviors were not reported. There did not seem to be a need for significant special supervision.

Finally, addressing how "mental impairments interfere with [Phillips's] day to day adaptive functioning," Dr. Hobby's evaluation further reported:

> This individual reported being able to drive a car on familiar roads, and he has a license. He said he could drive on unfamiliar routes. He said he can drive alone for distances up to 40 miles from home. He reports the following problems with being able to shop adequately for groceries, clothing, and personal items: he can't remember what to get. He reports the following problems with being able to use a checkbook to pay bills: he has never used checks. He reports the following problems with being able to make change and purchase things at the

-10-

store with cash: they have to count it for him. He reports that he participates in the following social groups: Immediate family, church groups. On a typical day he gets up at 1 p.m. During the day he sits in the house and goes places with his grandfather and does things with his friend. In regard to [activities of daily living], his reported MENTAL impairment DOES NOT appear to significantly impact an independent level of feeding himself, bathing, self-care, personal hygiene, and dressing.

(Emphasis in original.) Even if we credited Phillips's 2006 IQ scores as "compatible with [his] current behavior," and "as a valid indication of [his] current status," 20 C.F.R. § 404, Subp. P, App. 1, § 112.00D.10, then "we . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJ resolved the conflict by finding that "[t]he 2010 assessment of [Phillips's] intellectual ability is more accurate and consistent with the claimant's daily activities." Taken together, Phillips's higher IQ scores on Dr. Birmingham's 2008 evaluation, and his day-to-day functioning as reported by Dr. Birmingham and Dr. Hobby, supports the ALJ's determination that the 2010 scores are the most reliable present indicator of his IQ. This is "evidence of a change in [Phillips's] intellectual functioning." *Muncy*, 247 F.3d at 734. "Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind would find adequate to support the Commissioner's decision." *Davidson*, 501 F.3d at 989 (citing *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007)). Applying this deferential standard of review, we hold that substantial evidence supports the ALJ's finding that Phillips does not meet the first element of Listing 12.05C.[4]

---

[4]Because we find that Phillips does not meet the first element of Listing 12.05C, we do not reach the question of whether his ADHD meets the third element of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *McNamara*, 590 F.3d at 611.

B. *Medical Equivalence*

Phillips also argues that his condition medically equals Listing 12.05C. Our leading case on medical equivalence is *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003). As that case explains, under SSA regulations,

> if a claimant has more than one impairment, the combined effect of the impairments will be considered. [*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987)]. The medical equivalence regulation states "[i]f you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment." 20 C.F.R. § 404.1526(a).

*Id.* (second alteration in original). "The Commissioner has issued instructions for determining medical equivalence through the Program Operations Manual System ('POMS')." *Id.* "Although POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." *Id.* (citing *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000); *List v. Apfel*, 169 F.3d 1148, 1150 (8th Cir. 1999)).

The applicable POMS provide:

> D. Determining Medical Equivalence in Particular Situations
>
> 1. MEDICAL EQUIVALENCE AND MENTAL RETARDATION Listing 12.05C, Mental Retardation and Autism, applies primarily to adults with significantly subaverage intellectual functioning and deficits in adaptive behavior that were initially manifested in the individual's developmental period (before age 22). As

with other mental impairment categories, the focus of Listing 12.05 is on the individual's inability to perform and sustain critical mental activities of work.

* * * * * *

c. 12.05C

Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g.70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS § DI 24515.056.

*Id.* at 424 n.7 (alteration in original). "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with [Listing] 12.05." 20 C.F.R. § 404, Subp. P, App. 1, 12.00D.6.c; *see also id.* at Subp. P, App. 1, 112.00D.9.

The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors. Generally,

more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources.

*Shontos*, 328 F.3d at 426 (citing 20 C.F.R. § 404.1527(d)).

The ALJ found that "[s]ince February 1, 2008, [Phillips] did not have an impairment or combination of impairments that . . . medically equals one of the listed impairments." The ALJ's report found that Phillips's only "severe impairment" is "borderline intellectual functioning." Phillips argues that the combination of his low IQ and ADHD is medically equivalent to Listing 12.05C. He contends that the lowest IQ scores obtained by Dr. Birmingham (i.e., 72) and Dr. Hobby (i.e., 71) are within the POMS medical equivalence range of 70 to 75 and that his case for medical equivalence is especially strong, given his long history of testing in the mentally retarded range. Furthermore, Phillips argues that his ADHD is a "'physical or mental disorder[] that impose[s] additional and significant work-related limitation of function.'" *See Shontos*, 328 F.3d at 424 n.7 (quoting POMS § DI 24515.056). Finally, Phillips argues that his case is closely analogous to *Shontos* because the ALJ improperly relied on the evaluations of Dr. Birmingham and Dr. Hobby, as opposed to the long history of evaluations performed by his treating mental-health professionals.

In *Shontos*, "the evidence of record establishe[d] that [the claimant] [had an] IQ of 72." *Id.* at 424. "Evidence from her treating mental health providers established that her anxiety, dependency, and depression would significantly interfere with her ability to work. In addition, evidence from Dr. Rabinowitz, the state's consulting physician, established that [the claimant] had physical limitations in addition to her mental health limitations." *Id.* The court found that the ALJ "discounted the medical opinion of [the claimant's] treating psychologist, and the opinions of [the claimant's] therapist and nurse practitioner . . . in favor of the opinions of non-treating, non-examining physicians and psychologists who relied exclusively on the medical

-14-

reports of others." *Id.* at 425. The court found that the ALJ "relied on the opinions of nontreating, nonexamining medical consultants who relied on the records of the treating sources to form an opinion," stating that "the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Id.* at 427.

Unlike in *Shontos*, Dr. Birmingham and Dr. Hobby *did* perform their own evaluations of Phillips, and those evaluations provided information on which the ALJ could properly determine that Phillips's condition is not medically equivalent to Listing 12.05C. The district court noted that Dr. Birmingham and Dr. Hobby reported that Phillips's ADHD was well-controlled by medication, and that there appeared to be no limitations on his ability to concentrate on basic tasks. *Phillips*, 2012 WL 3903473, at *3. The court stated that

> [t]his evidence supports the ALJ's determination that ADHD was a non-severe impairment because it showed ADHD did not significantly limit Phillips's mental ability to do basic work activities, in contrast to Phillips's intellectual functioning which significantly limited his ability to work. The medical evidence indicated Phillips's childhood ADHD could be controlled by medication, but Dr. Hobby's report showed that Phillips had the ability to attend to and sustain simple work-like tasks even without medication. The record indicates ADHD posed significant hurdles for Phillips as a child, but had little impact [on] Phillips as an adult.

*Id.* (footnote omitted). To be sure, Phillips acknowledged that his concentration and ADHD improved with medication, and he "admitted being able to perform personal care needs, household chores, and yard work." This case is similar to *Nguyen v. Chater*, in which we found that a claimant's impairment was not severe when medication improved it sufficiently to enable her to undertake "daily activities . . . incompatible with disabl[ement]." 75 F.3d 429, 431 (8th Cir. 1996); *see also* 20

-15-

C.F.R. § 416.921(a) (explaining that an impairment is not severe if it does not significantly limit one's ability to do basic work activities).

Consequently, we hold that substantial evidence supports the ALJ's finding that Phillips's condition does not medically equal Listing 12.05C.

### III. *Conclusion*

Because we hold that substantial evidence supports the ALJ's finding that Phillips's condition neither meets nor medically equals Listing 12.05C, we affirm the judgment of the district court.

_____