NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 10, 2014
Decided July 15, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 13-2921

| | |
|---|---|
| RONALD G. WARREN, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Southern District of Indiana, Evansville Division. |
| *v.* | |
| | No. 3:12-cv-71-WGH-RLY |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | William G. Hussmann, Jr., |
| *Defendant-Appellee.* | *Magistrate Judge.* |

### O R D E R

Ronald Warren, a 50 year-old former laborer and farm hand, appeals the denial of his application for disability benefits and supplemental security income. He argues that the administrative law judge erred in declining his request to order IQ testing and failed to account for his borderline intellectual functioning in the hypothetical posed to the vocational expert. We reverse the district court's denial of relief and remand with instructions to return this matter to the Acting Commissioner.

Warren was diagnosed with intellectual limitations at a young age. Starting at age three, he took several IQ tests, and his scores ranged from 62 to 75 (the average

score is 100, and 95% of the population scores between 70 and 130); his most recent score was 71 at the age of nine. Based on these scores, he was categorized as "educable mentally retarded." Warren spent his early years in special education classes, took general-education classes in high school, and graduated at the age of 20.

For the next two decades, Warren worked as a highway laborer and farm hand. His longest full-time job was working as a laborer for the county highway department, a position he obtained in 1994 when his father was county commissioner and lost in 2003 after a second DUI conviction. Over the same period he also helped tend livestock and bale hay on his parents' farm; his farmwork trailed off after his father's death in 2005, though he mowed the pasture on the last portion of family farmland up until 2008 (when they sold it), using a special platform to lift him in and out of the tractor.

Warren applied for disability insurance benefits and supplemental security income in 2009, at the age of 46, claiming that he no longer could work because of his back pain, knee pain, diabetes, obesity, heart problems, frequent shortness of breath, and depression. He said that pain in his back and knees had worsened earlier that year, preventing him from sitting or standing for long periods. At the time he lived with his mother, a double-leg amputee, and helped care for her as she moved in and out of nursing homes until her death in late 2009. He alleged an onset date of 2003 (when he lost his job with the highway department), which he later changed to 2008.

In connection with his application for benefits, Warren underwent a physical examination in late 2009 and a psychological evaluation in late 2010. The doctor who conducted the physical diagnosed Warren with type-II diabetes, obesity, and high blood pressure. He noted that X-rays from 2009 showed mild degeneration in the lumbar spine, but he concluded that Warren's range of motion was normal except for a decreased ability to bend and twist his spine. The psychologist did not administer an IQ test, but he estimated that Warren's intelligence was "borderline" and assessed Warren as having "mild difficulty in terms of social/occupational function." He opined that Warren could understand and carry out simple instructions for sustained periods.

The remaining opinions in the record, from two state-agency doctors who reviewed the medical records and an orthopaedist who examined Warren once in 2010, disagree over the extent to which Warren could sit or stand without pain. The state doctors opined that Warren could sit for six hours per day and stand or walk for six hours per day. The orthopaedist, James Rang, disagreed; in his opinion, Warren could not stand or walk for more than one hour, or sit longer than three hours. He estimated

that those limitations had "most likely existed for at least two years." Based on an X-ray and a physical exam, Rang diagnosed Warren with osteoarthritis in his knee and pelvis, degeneration in his lower spine, and greater trochanteric bursitis (hip inflammation).

At his hearings before the ALJ, Warren described performing his own chores and participating in church activities. Since his mother's death, he explained, he lived alone and took care of yardwork, grocery shopping, and laundry, spending about one hour each day on chores and taking a break from yardwork at half-hour intervals. He built a few picnic tables and benches for friends, but added that he took many breaks. Warren said that he could not stand long because his lower back pain would radiate, numbing his legs. He testified that he could sit for about 10 to 15 minutes before having to move to a different position to relieve his back pain. Warren's weekly activities included attending church, singing in the choir, and leading Alcoholics Anonymous meetings at his church and in the nearby counties.

At a follow-up hearing before the ALJ (after a psychological evaluation had been completed at the ALJ's request), a vocational expert testified that Warren's prior jobs included unskilled and semi-skilled work, with medium exertion levels. The expert explained that a person limited to simple, repetitive tasks would be qualified to perform unskilled work as an auto detailer, hand packer, or laborer and that thousands of these jobs existed in the regional and national economy.

The ALJ concluded that Warren was not disabled within the meaning of the Social Security Act. Following the required five-step analysis, the ALJ determined that Warren had not worked since his alleged onset date in 2008 (step one); that he suffered severe impairments, including diabetes, obesity, lower spine degeneration, high blood pressure, mild congestive heart failure, bereavement, borderline intelligence, polysubstance dependence, hip inflammation, and osteoarthritis of the knee and hip (step two); these impairments did not meet or equal a listed impairment (step three); he had the residual functional capacity to perform unskilled work involving simple and repetitive tasks, though he could no longer perform his past semi-skilled work as a highway maintenance worker (step four); and, based on the vocational expert's testimony, there were jobs that Warren could perform in the regional and national economy (step five). *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

In assessing Warren's mental impairments, the ALJ concluded that he did not meet Listing 12.02 for organic mental disorders because he did not show marked restrictions in any of four areas: daily living, social functioning, maintaining

concentration, or episodes of decompensation. *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.02(B). The ALJ pointed to Warren's past semi-skilled work to explain why additional IQ testing was unnecessary; since losing that job in 2003, the ALJ noted, there was no record that his mental condition had deteriorated. The ALJ also stated without elaboration that Warren's childhood IQ scores were "not consistent with the need for additional IQ testing." With respect to Warren's back and knee pain, the ALJ questioned his subjective complaints, given his ability to walk a mile every other day and the minimal treatment he had received to date. The ALJ gave "little weight" to Dr. Rang's opinion, noting that the exam was conducted at the behest of Warren's lawyer.

After the Appeals Council denied review, a magistrate judge—presiding with the parties' consent—upheld the decision. The court concluded, first, that the hypothetical questions posed to the vocational expert were not flawed because they accounted for Warren's mental limitations by requiring simple, repetitive tasks. The court determined, next, that the ALJ reasonably discounted Dr. Rang's opinion based on Warren's lack of treatment for back or knee problems. Third, although the denial of Warren's request for IQ testing was a "close call," the court concluded that Warren did not show continuing constraints on his intellectual ability after childhood. Given Warren's past semi-skilled work, the court concluded, substantial evidence supported the ALJ's determination that Warren had not shown a disabling mental impairment.

On appeal Warren argues that the ALJ, in declining to order an IQ test, failed to develop the record necessary to make a decision on his intellectual limitations. He points to his childhood scores as evidence suggesting that he is disabled under Listing 12.05C, which covers "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" and requires an IQ score of 60 through 70. *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05.

As the magistrate judge noted, this issue is a close call, but we agree with Warren that his adult IQ score was necessary to evaluate his intellectual ability. ALJs have a duty to develop a full and fair record and must order supplemental testing when the gap in the medical record is significant and prejudicial. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Here the gap is significant because Warren needed a valid IQ score of 60 through 70 to establish an impairment and prejudicial because his childhood IQ scores appear to show that his intellectual limitations manifested before age 22, yet the ALJ offered no reason for declining to order more recent testing in light of those scores. (At oral argument the government noted that Warren scored at 70 or below only on a

picture-vocabulary test disfavored under the regulations, *see* 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00(D)(6)(d), but the ALJ did not rely on this reason, so neither can we, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).) Because intellectual abilities are generally presumed to remain stable over time, the ALJ should have considered the likelihood that Warren would score at or below 70 today. *See Phillips v. Colvin*, 721 F.3d 623, 626–27 (8th Cir. 2013) (explaining that ALJs must discuss discrepancy between IQ scores in light of presumed stability); *Hodges v. Barnhart*, 276 F.3d 1265, 1268–69 (11th Cir. 2001) ("IQ tests create a rebuttable presumption of a fairly constant IQ throughout [the claimant's] life"). Given evidence showing intellectual limitations at a young age, the ALJ needed more recent testing to fairly assess Warren's intellectual abilities.

Warren next argues that the ALJ did not appropriately account for his borderline intellectual functioning in the hypothetical given to the vocational expert. We agree. The hypothetical must account for both the complexity of the tasks and the claimant's ability to stick with a task over a sustained period. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009). Here the ALJ's hypothetical accounted for only complexity: relying on the psychologist's opinion that Warren could handle simple instructions, the ALJ limited the vocational expert to jobs requiring "simple, repetitive tasks." We have cautioned that this exact language does not account for limitations on concentration, *see O'Connor-Spinner*, 627 F.3d at 620, but the ALJ did not discuss whether Warren could maintain concentration, persistence, and pace for unskilled tasks, *see Simila v. Astrue*, 573 F.3d 503, 520–21 (7th Cir. 2009). The ALJ should have discussed Warren's ability to complete simple tasks for sustained periods, bearing in mind that the government has the burden of proof at this step in the analysis. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

With respect to his residual functional capacity, Warren argues that the ALJ erred in rejecting the orthopaedist's opinion that he could not sit or stand long enough for full-time work. Warren asserts, first, that Dr. Rang's opinion should have received controlling weight because he was an "examining physician," and, second, that the ALJ improperly devalued Rang's assessment partially because Rang conducted the exam "at the request of the claimant's attorney for the purposes of disability."

The ALJ was not required to give Rang's opinion any particular weight because Rang does not have an ongoing treatment relationship with Waren, 20 C.F.R. § 404.1502; *see Simila*, 573 F.3d at 514; *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005), but the ALJ could not reject Rang's opinion simply for being solicited by a lawyer, *see Punzio v.*

*Astrue*, 630 F. 3d 704, 712 (7th Cir. 2011). Because it is not clear how much the ALJ devalued Rang's opinion based on the lawyer's involvement, on remand the ALJ should reconsider the opinion in light of the brief nature of the one-time examination, the supportability of Rang's explanation, the X-ray he relied upon in offering his opinion, and its overall consistency with the medical record. *See* 20 C.F.R. § 404.1527(c); *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013).

Finally Warren argues that the ALJ focused too much on his daily activities in finding that his statements "concerning the intensity, persistence and limiting effects" of his pain were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." As the magistrate judge observed, we have repeatedly criticized this boilerplate statement for suggesting that ALJs analyze the claimant's capabilities *before* assessing credibility. *See, e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012). Despite that unhelpful language, however, the ALJ appropriately considered Warren's daily activities in his evaluation of Warren's complaints of back and knee pain. *See Pepper v. Colvin*, 712 F.3d 351, 368–69 (7th Cir. 2013) (adverse credibility determination upheld when claimant drove, shopped, and prepared meals despite her testimony that she had trouble sitting and standing); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) (adverse credibility finding upheld when claimant regularly completed his daily household activities without pain medication).

The district court's denial of relief is **REVERSED** and this case is **REMANDED** with instructions to return the matter to the Social Security Administration for further proceedings consistent with this order.